603 A.2d 1241

**UTICA MUTUAL INSURANCE COMPANY**

v.

**BAUSCH & LOMB INCORPORATED.**

**No. 657, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

April 3, 1992.

**2**

John B. Wyss (Michael R. Cannon, Joseph L. Ruby, Wiley, Rein & Fielding, Washington, D.C., M. King Hill, III and Venable, Baetjer & Howard, Towson, on the brief), for appellant.

Joseph D. Tydings and Jordan Stanzler (Mark A. Kolman, Catherine D. Serafin, Jean E. Zimmerman, Edward M. Joyce, Anderson Kill Olick & Oshinsky, Washington, D.C., Charles Taylor and Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, on the brief), for appellee.

Lee H. Ogburn and Kramon & Graham, P.A., Baltimore, for amicus curiae, John Richard Ludbrooke Youell. (Michael Nussbaum, Martin R. Baach, Mark J. Leimkuhler and Nussbaum & Wald, Washington, D.C., of counsel).

Roger E. Warin, Virginia L. White–Mahaffey, Harry Lee, Charles F. Monk, Deborah L. Pollock and Steptoe & Johnson, Washington, D.C., for amicus curiae, Ins. Environmental Litigation Ass'n.

Emory Plitt, County Atty. for Harford County and Jefferson Blomquist, Asst. County Atty., Bel Air, John J. McMullen, Jr., County Atty. for Allegany County, Cumberland, H. Emslie Parks, County Atty. for Baltimore County, Towson, Stephen R. Beard and Stephen M. LeGendre, County Attys. for Anne Arundel County, Annapolis, William R. Bailey, County Atty. for Calvert County, Prince Frederick, Charles W. Thompson, Jr., County Atty. for Carroll County, Westminster, H. Norman Wilson, Jr., County Atty. for Cecil County, Elkton, John S. Mathias, County Atty. for Frederick County, Frederick, Barbara Cook, County Sol. for Howard County, Ellicott City, Joyce R. Stern, County Atty. for Montgomery County, Rockville, Joseph R. Densford, County Atty. for St. Mary's County, Leonardtown, Clinton S. Bradley, III, President of Talbot County Council for Talbot County and James M. Slay, Jr., County Atty. for Talbot County, Easton, Ralph H. France, II, County Atty. for Washington County, Hagerstown, Edgar A. Baker, Jr., County Atty. for Wicomico County, Salisbury, and Edward H. Hammond, Jr., County Atty. for Worcester County, Ocean City, for amicus curiae, Fifteen Maryland Counties in support of appellee/cross-appellant Bausch & Lomb Inc.

Argued before ALPERT, BLOOM and MOTZ, JJ.

BLOOM, Judge.

These cross-appeals by Utica Mutual Insurance Company (Utica) and Bausch & Lomb, Inc. (B & L) are from a judgment of the Circuit Court for Baltimore County in a declaratory judgment action brought by Utica, in which B &

L had filed a counterclaim for damages for breach of contract.

Utica's action sought a judicial determination and declaration of the parties' respective rights and obligations under a comprehensive general liability (CGL) insurance policy issued by Utica to B & L. Specifically, Utica sought a determination as to whether it was responsible and liable, under its policy, for costs and expenses incurred by B & L in removing hazardous waste materials from its property in Sparks, Maryland, on which it operated its Diecraft manufacturing plant. B & L's counterclaim asserted claims for bad faith as well as for breach of contract, but the court struck out the bad faith count as legally insufficient, while allowing the breach of contract count as a corollary to the declaratory judgment action.

After a two week trial and an all-day hearing, the court announced several rulings from the bench. Several weeks later, the court conducted another day long hearing concerning B & L's claim for counsel fees, and, on 19 March 1991, the court issued the following judgment:

### DECLARATORY JUDGMENT

For the reasons stated on the record in open court on December 19, 1990 and February 13, 1991, this court makes the following declaration:

1. That Utica Mutual Insurance Co. (Utica) did have a duty to defend claims and to pay damages because of property damage for cleanup costs for hazardous waste materials at the Bausch & Lomb Incorporated (Bausch & Lomb) site known as Diecraft as a result of applicable insurance coverage afforded by Utica. The cleanup costs compensable at this time are in the amount of $231,-262.53.

2. That Utica had, and in the future will have no legal responsibility to defend or pay investigatory damages required by the State of Maryland to monitor the Diecraft site before or following removal of hazardous material.

The investigatory or preparation fees and costs expended by Bausch & Lomb to ascertain the extent of contamination at the site through the date of trial in the amount of $529,897.30, and such fees and costs which may be expended in the future, are not payable or responsible to be defended under the insurance coverage afforded.

3. That Utica had no legal responsibility to reimburse B & L for $9,372.76 in State of Maryland personnel costs for regulatory management relating to the Diecraft Site, and will have no obligation for such costs in the future.

4. That under the applicable insurance coverage, Utica will be required in the future to defend actions brought to compel removal of hazardous waste material, and to pay the cost of removing such material, if any, from the Diecraft Site depending on whether potential for liability exists in the claim made and removal is required by the State of Maryland under applicable law, the extent of which will depend on future events.

5. That for its breach of its duty to defend after notice of a potential claim and for the cost of this Declaratory Judgment action and the failure to pay cleanup costs, Utica is required to pay Bausch & Lomb the following sums:

*Attorneys' Fees: $534,500*

1. *Anderson, Kill, Olick & Oshinsky, P.C.:* $426,500
2. *Gordon, Feinblatt, Rothman, Hoffberger & Hollander:* $108,000

*Expenses: $44,306.47*

1. First Risk Management (Silver): *$39,456.47*
2. *Other Expenses* (primary) *Transcript costs:* $4850

6. Judgment is entered in favor of Bausch & Lomb Incorporated against Utica Mutual Insurance Company in the amount of $231,262.53 plus attorneys fees of $534,500 and expenses of $44,306.47 plus court costs.

Utica's appeal challenges the declarations in paragraphs 1, 4, and 5 and the money judgment awarded in paragraph

6. B & L's appeal asserts error with respect to paragraphs 2 and 3 of the declaratory judgment.

We shall reverse the judgment of the circuit court.

## *Facts*

Utica is a New York mutual insurance company head-quartered in New Hartford, New York. B & L is a Fortune 500 corporation also headquartered in New York. Utica sold comprehensive general liability insurance to B & L for some forty years, with the last policy being issued in 1986.

All the policies issued by Utica to B & L from 1970 to 1986 provided, as a condition of coverage, that B & L (a) shall give written notification to Utica "as soon as practicable" in the event of an occurrence, and (b) shall forward to Utica "immediately" every demand or notice of a claim. The basic coverage provision of all the policies stated, in pertinent part:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of … property damage … caused by an occurrence. …

The standard language defines "occurrence" as:

> [A]n accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

"Property damage" is in turn defined as:

> [P]hysical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom. …

Each policy Utica issued to B & L expressly provided that B & L "shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident."

The standard policy language included seventeen lettered paragraphs of exclusions from coverage. Of these, Paragraphs K and L have some pertinence to this case. By

virtue of paragraph K, the coverage of the policy did not apply to property damage to property owned by the insured, or to property occupied by, rented to, used by, or in the care, custody, or control of the insured. An endorsement to the policy eliminated Paragraph K as an exclusion but limited the coverage for any damage that would otherwise have been excluded under that paragraph to $50,000.00. Under Paragraph L, coverage of the policy did not apply to property damage "to premises alienated by the Named insured arising out of such premises or any part thereof." [1]

In 1965, B & L purchased the Diecraft manufacturing plant and 30 acres of associated property located in Sparks, Maryland. The plant machined and plated parts used in telescopes and microscopes. From 1958 through 1975, waste plating bath liquids, solvents, and wastewaters were disposed of on-site into a waste disposal system. That system was composed of a series of concrete settling tanks, an unlined earthen lagoon, a holding tank, three large drywells, and a network of associated piping. Overflow pipes were added to the drywells when the volume of waste that was piped into the drywells exceeded the absorption capacity of the soils and bedrock that underlie the drywells. Overflow pipes ran downhill in a westerly direction into an undeveloped wooden area behind the plant. B & L first discovered that its property was contaminated in November of 1982, when analysis of soil samples from behind the plant revealed high levels of a potentially hazardous substance, cadmium, in excess of federal regulations. On 4 February 1983, B & L notified the United States Environmental Protection Agency of the contamination. In October or November of 1983, B & L hired an environmental consulting

---

1. Understandably, neither party mentioned or referred to exclusion Paragraph K or to the rider eliminating it and substituting a limited liability for it. B & L's claim greatly exceeds the $50,000 limitation of the rider; Utica prefers to rely upon exclusion Paragraph L, under which it would not be subject to even $50,000 of liability.

In the view we take of the case, it is unnecessary to decide whether either Paragraph L or the rider to Paragraph K of the policy exclusions applies to the facts of this case.

firm, Fred C. Hart & Associates (Hart), to investigate the contamination and make remedial suggestions. By February of 1984, B & L was interested in selling the Diecraft property. In mid–1984 Hart personnel discovered that, in addition to heavy metals, the Diecraft property was contaminated by the organic solvent trichloroethylene (TCE). Hart continued its investigation of both heavy metal and TCE contamination and, on 15 November 1985, issued a 90–page "Report of Field Investigation Phases I, II and III."

B & L met with representatives from the Maryland Waste Management Administration in October of 1985. In December of that year, the Administration issued a "Preliminary Assessment Report," which stated that "recommendations and conclusions regarding any corrective measures that may be necessary at this [Diecraft property] will be evaluated after the consultant's [Hart's] survey and sampling of the site has been completed." Additional meetings were held in November and December of 1986, and B & L indicated it would comply with the State's directives.

On or about 19 June 1987, B & L received a letter from counsel for the neighboring landowner, Highlands Park I Limited Partnership, alleging damage to the groundwater on the Highlands property and threatening litigation. As a result of the Highlands letter, B & L notified Utica of the "potential claim" by a letter dated 26 June 1987. This was the first notification Utica received concerning the contamination of the Diecraft property. The June 26 letter suggested that B & L would look to Utica to reimburse some $76,000.00 spent for testing and assessing the contamination on the Diecraft property. B & L also transmitted 600 pages of material concerning the environmental claims of the State.

Utica responded to B & L's letter on 21 July 1987. It asked B & L to provide copies of records concerning the Diecraft property so that Utica could make a specific coverage determination. On 27 August B & L again requested that Utica honor its obligation to provide coverage for cleanup costs and for damages to adjacent property. On 5

November 1987, B & L consummated a sale of the property, with the purchaser acquiring the assets and business of B & L's Optical Systems Division, including the Diecraft Facility, while B & L retained the environmental liabilities.

Further negotiations between the parties proved fruitless, and on 20 November 1987 Utica filed the declaratory judgment action in the Circuit Court for Baltimore County.

## *Discussion*

Utica contends:

1. B & L's admitted assumption of cleanup liability, without notice to or consent by Utica, defeats coverage as a matter of law.

2. B & L's costs to clean up its own property pursuant to a contract of sale are not sums which B & L was "legally obligated to pay" within the meaning of the Utica policy.

3. B & L's cleanup of its own Diecraft property does not constitute "damages" because of "property damages."

4. B & L's failure to give timely notice to Utica bars coverage.

5. The trial court erred in awarding B & L its attorney's fees and expenses for this declaratory judgment action.

With respect to Utica's appeals, B & L contends:

1. Utica waived the right to contest payment of cleanup costs made after Utica refused to provide coverage and after it filed this declaratory judgment action.

2. The trial court's findings that B & L acted under compulsion from the State were not clearly erroneous.

3. Because there was unrebutted evidence that the standard form CGL policy was intended to provide coverage for cleanup costs, the circuit court correctly determined that Utica was obligated to pay those costs.

4. The trial court's findings that there was timely notice and that Utica failed to prove prejudice were not clearly erroneous.

5. B & L is entitled to recover attorney's fees incurred in defending Utica's declaratory judgment action.

And, with respect to its counterclaim, B & L contends:

6. In view of the circuit court's determination that Utica breached its contractual duty to investigate and defend the claims of the State, B & L is entitled to the money it spent to investigate and defend the claim.

7. Given the undisputed facts of continuous damage to groundwater, B & L is entitled to coverage under all policies in effect during the entire period of damage.

We agree with Utica's contention that the costs incurred by B & L for investigation cleanup, *i.e.,* removal from its own property of contaminating waste materials it had deposited thereon, are not "damages" within the coverage clause of the standard CGL policies issued by Utica. We hold, therefore, that Utica is not liable under any of the policies it issued to B & L either for the cleanup costs, the expenses of investigating and defending the State's "claims," or the costs of defending Utica's declaratory judgment action. Accordingly, we shall reverse the judgment of the circuit court. It will not be necessary for us to address the other issues raised by both parties other than to touch briefly on B & L's third contention.

## I

■ B & L has not directed us to any portion of the record that supports its contention that there was unrebutted evidence that the standard CGL policy was intended to provide coverage for cleanup costs. What it did refer us to was some testimony by an employee of B & L, its "risk manager," James T. Caffrey, to the effect that *he* believed the policy covered cleanup costs and that a separate policy that would specifically cover such costs was not necessary.

We were not referred to any evidence that would constitute an objective basis for that belief.

 There was some evidence to the effect that the insurance industry recognized gradual environmental pollution from hazardous waste or contaminants as an occurrence within the meaning of CGL policies, but such policies do not require the insurer to pay merely because there is an occurrence. The policy requires the insurer to pay such sums as the insured is legally obligated to pay as damages because of personal injuries or property damage resulting from an occurrence.

## II

 This case is far from unique. There is a considerable body of case law in federal as well as in state courts on the question as to whether cleanup costs are damages covered by a CGL policy. B & L relies heavily on the fact that a majority of such cases hold that cleanup costs are covered. Among the cases to the contrary, clearly espousing the minority rule, is *Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988). In that case the Fourth Circuit, applying its interpretation of Maryland law, flatly held that cleanup costs were not covered by a standard CGL policy containing coverage language similar to that found in Utica's policy. Naturally, Utica relies very heavily on *Armco*.

There is an excellent discussion of the subject in the recent case of *A.Y. McDonald Industries v. INA*, 475 N.W.2d 607 (Iowa 1991). As the Supreme Court of Iowa noted, in responding to certified questions from the United States District Court from the Northern District of Iowa, the coverage question centers on the language in CGL policies: "all sums which the insured shall become legally obligated to pay as damages because of ... property damage," the issue being whether that language covers response or cleanup costs incurred under environmental pro-

tection statutes. *Id.* at 618. The Court noted that nearly all of the state appellate courts that have considered the issue have concluded that such costs are covered, whereas federal courts, purporting to apply state law in resolving the issue, are sharply divided. Some of the cases imposing liability on the insurer involved suits by the government or third parties for reimbursement of their costs in remedying and mitigating environmental damages. Those cases are factually distinguishable from the case at bar, and liability is imposed on the carrier either on the theory that such costs are plainly damages that the insured is legally obligated to pay as compensation for "property damage" or on the theory that the terms "damages" and "legally obligated" are ambiguous and thus must be resolved in favor of coverage.

With respect to the more troublesome question concerning compliance with environmental injunctions, most state courts have held that the costs of compliance are covered as fitting the ordinary meaning of "damages." Other courts have concluded that a contrary holding would unreasonably make coverage depend on the "mere fortuity" of which alternative—injunction reimbursement, or damages to natural resources—the government agency chooses in enforcing the environmental protection law. Still other courts base a finding of coverage on the theory that such costs are damages within the reasonable expectations of the parties. 475 N.W.2d at 615–16.

The Iowa Supreme Court also noted the different bases for the conflicting results in the federal courts, dealing with action taken by the Environmental Protection Agency (EPA) under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980) (CERCLA), 42 U.S.C. § 9601, *et seq.* Some federal courts, like most of the state courts, see both forms of relief sought by the EPA under CERCLA, recovery of cleanup costs and costs of compliance with environmental injunctions, as constituting "damages" under the CGL policies. Some courts, on the other hand, draw a distinction between damages to natural

resources, recoverable by the EPA under CERCLA, and response costs; the former are considered to be damages within the meaning of the CGL policies but the latter are not. Other federal courts have concluded that the term "damages" in CGL policies has a legal, technical meaning that is unambiguous in the insurance context. Those courts have held that "damages" in a CGL policy does not include costs of compliance with injunction relief available under CERCLA and similar statutes. That is the view taken in the Fourth and Eighth Circuits. *See Md. Cas. Co. v. Armco, supra; Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co., Inc. (NEPACCO)*, 842 F.2d 977 (8th Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Grisham v. Commercial Union Ins. Co., et al.*, 951 F.2d 872 (8th Cir.1991). (In *NEPACCO*, the Court of Appeals for the Eighth Circuit was applying Wisconsin law; in *Grisham*, it applied Arkansas law.)

The precise issue before us has not heretofore been addressed by the Court of Appeals of Maryland or this Court. Nevertheless, we believe that our resolution of this issue is controlled by case law of this State.

The Court of Appeals, in *Cheney v. Bell National Life*, 315 Md. 761, 766–77, 556 A.2d 1135 (1989), stated that when interpreting insurance contracts

we accord a word its usual, ordinary and accepted meaning unless there is evidence that the parties intend to employ it in a special or technical sense. Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer. Rather, following the rule applicable to the construction of contracts generally, we hold that the intention of the parties is to be ascertained if reasonably possible from the policy as a whole. In the event of an ambiguity, however, extrinsic and parol evidence may be considered. If no extrinsic or parol evidence is introduced, or if the ambiguity remains after consideration of extrinsic or parol evidence that is introduced, it will be

construed against the insurer as the drafter of the instrument. (Citations omitted).

In *Maryland Cas. Co. v. Armco, Inc.* 822 F.2d 1348 (4th Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988), the Maryland Casualty Company sought a declaratory judgment, as Utica did in the case at bar, concerning its liability to its insured, Armco, Inc., under a comprehensive general liability policy. The United States had brought suit against Armco, seeking reimbursement and injunctive relief for alleged endangerment to the environment at a hazardous waste site in Missouri. The Fourth Circuit, applying its interpretation of the law of Maryland, held "that the claim seeking compliance with regulatory directives of a federal agency, which compliance takes the form of obedience to injunctions and reimbursement of remedial costs, does not constitute a claim for 'damages' under the insurance policy." *Id.* at 1350. The "damages" portion of the CGL policy at issue in *Armco* is virtually identical to the "damages" provision in Utica's policy:

[To] pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by an occurrence;....

*Id.* In affording the term "damages" a legal, technical definition, the U.S. Court of Appeals for the Fourth Circuit stated:

If the term "damages" is given the broad, boundless connotations sought by the appellant, then the term "damages" in the contract between Maryland Casualty and Armco would become mere surplusage, because any obligation to pay would be covered. The limitation implied by employment of the phrase "to pay as damages" would be obliterated.

*Id.* at 1352.

This Court, in *Maryland Cup Corp. v. Employers Mut. Liab. Ins. Co.,* 81 Md.App. 518, 568 A.2d 518 (1990), adopted the reasoning of *Armco* in holding that three complaints

filed with the Equal Employment Opportunity Commission and a suit brought against Employers Mutual under Title VII, where the plaintiff was limited to equitable relief only, were not claims or suits seeking "damages" as that term was used in the liability policies in question. In reaching our decision, we noted that the cases that reject the *Armco* reasoning can be broken into "two distinct rationales." *Id.*, at 524, 568 A.2d 518. The first rationale, which was advanced by the insured in *Maryland Cup*, "is that the broad construction of 'damages' is correct because a reasonably prudent lay person would not make the technical distinction between 'damages' and 'equitable relief' that the *Armco* court made." *Id.* The second rationale, not directly addressed by this Court in *Maryland Cup*, but at issue here, is whether "it is unreasonable for insurance coverage to depend on whether the state decides to clean up the pollution itself and sue for damages or chooses to pressure the insured into performing the cleanup, because it is the reasonable expectations of the parties that should determine liability and not this 'mere fortuity.'" *Id.* at 525, 568 A.2d 518, citing *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 336 N.W.2d 838 (1983). We noted, however, that this second rationale "was effectively rebutted by the Fourth Circuit in *Armco*, 822 F.2d at 1353–54." *Maryland Cup*, 81 Md.App. at 526, 568 A.2d 518.

In addressing that issue, the *Armco* court stated:

Insurance policies, probably for reasons of certainty and economy, traditionally reimburse only damages arising from actual, tangible injury. Insurers are very reluctant to cover what are essentially prophylactic measures, such as safety precautions, for the obvious reason that such expenditures are subject to the discretion of the insured, and are not connected with any harm to specific third parties. Insurers require certainty as to the extent of their liability and this certainty is set forth in the insurance policy, which in the instant case was a negotiated manuscript policy. The less obvious, but perhaps more telling reason that insurers are reluctant to cover avoid-

ance costs is that insureds are far more likely to overutilize safety measures where another party is paying the bill. Should policies be construed to cover some forms of harm-avoidance measures, courts would be faced with the very difficult problem of separating needed prophylactic measures from unnecessary or inefficient ones.

*Armco,* 822 F.2d at 1353.

Appellee contends that the cleanup costs it incurred are covered under the Utica policy as "damages." Specifically, appellee argues that the trial court was correct in finding that the term "damages" is ambiguous and should be accorded its ordinary meaning as a lay person would understand it. The *Maryland Cup* decision rejected that reasoning in holding that claims seeking equitable relief are not "damages."

### III

B & L next contends that the groundwaters under the surface of its land belong to the State of Maryland; that by contaminating those groundwaters it had damaged property of another; and, consequently, that the cleanup costs it had incurred were sums it was obligated to pay as damages because of property damage caused by an occurrence. The first premise of that argument is, at best, highly debatable; and even if it were true, the conclusion would not necessarily logically follow.

B & L has referred us to no authority for the proposition that the State owns the groundwater beneath the surface of the Diecraft plant property in Sparks. We are aware of no authority, statutory or case law, to that effect. There is authority for the proposition that the State has a proprietary interest, in the nature of a *quasi* trusteeship for the public benefit, in the navigable waters within its boundaries, *Mayor and City Council v. Baltimore and Philadelphia Steamboat Co.,* 104 Md. 485, 65 A. 353 (1906). That interest was held to be sufficient to enable the State to sue for pollution damages to the waters in Baltimore Harbor

caused by an oil line rupture. *See State of Maryland, Dept. of Natural Resources v. Amerada Hess Corp.,* 350 F.Supp. 1060 (D.C.Md.1972). Maryland has retained the "ownership" of the navigable waters in the "ports, harbors, bays, rivers and straights" as set forth in the 4th section of the Charter to Lord Baltimore. *See Browne v. Kennedy,* 5 H. & J. 195, 204 (1821). It has not asserted any claim of ownership of waters beneath the surface of lands granted by Lord Baltimore, his successors, or the State.

The State, as Trustee for its citizens, does have the authority, within its police power, to preserve its natural resources and to prevent pollution to air and water. But such power and authority does not depend upon any claim of ownership of either the water below the surface of the land or the air above it.

Moreover, even if there were any merit in the argument that damage had been done to the State's property, that would be irrelevant to this case. The damages that were awarded by the lower court were for costs incurred in removing waste materials from B & L's own property—materials that it itself had placed there—and for counsel fees incurred in dealing with the State and in defending Utica's declaratory judgment action. Neither the State nor any neighboring property owner has asserted a claim for damage to its, his, or her property; no costs of defending such claims, and no award of damages for property damage sustained by the State or anyone else (other than B & L) as a result of B & L's dumping of waste products on its property is involved in this case.

## IV

Having discovered that the waste materials it had been depositing on its land was causing or threatened to cause damage to the environment and neighboring properties, B & L was at risk of an action by the State or, possibly, the EPA either to enjoin it to clean up its property or for damages to the environment. It was also at some

risk of an action by an adjoining landowner for damaging his property. An injunction action would not be a covered claim for damages. *Maryland Cup, supra.* A suit by an adjoining landowner for damages to his property would clearly be a covered claim that Utica would have to defend, and if the claim resulted in a judgment against B & L, Utica would have to pay it. Whether an action by the government for damages to the environment or, possibly, for cleanup costs to B & L's property incurred by the government would be a covered claim for damages is an issue we need not address here.

Recognizing that the failure to act might well subject it eventually to even greater costs, B & L did not wait for the inevitable lawsuits against it for injunction or money damages or both. It undertook—Utica says voluntarily but the trial court found that B & L acted under compulsion—to clean up its property. To the extent that B & L's cleanup costs avoided a claim and lawsuit for damages to property that would be covered by Utica's CGL policy, B & L's situation was analogous to that of the holder of a certificate of Comprehensive General Liability Insurance in the case of *W.M. Schlosser Co., Inc. v. Insurance Company of North America*, 325 Md. 301, 600 A.2d 836 (1992).

In *Schlosser,* the United States Court of Appeals for the Fourth Circuit certified to the Maryland Court of Appeals the following question of law:

> Whether costs incurred by the certificate holder to avoid imminent catastrophic damage to the property of others are recoverable under the terms of a Comprehensive General Liability Policy where the certificate holder's actions were necessitated by the insured's negligent workmanship.

W.M. Schlosser Co., Inc., had entered into a contract with Fairfax County Virginia, to build a pumping station. The contract provided that Schlosser would indemnify, hold harmless, and be strictly responsible to Fairfax County for any and all damage to existing and partially complete structures of the county arising out of Schlosser's opera-

tions and activities attributable to it or any of its subcontractors. Schlosser entered into a subcontract with Geofreeze Corporation under which Geofreeze undertook to complete the temporary ground support, ground water control, and rough excavation phases of the project. Geofreeze also agreed to indemnify and hold harmless Schlosser and the County from any and all claims and expenses for property damage arising out of or resulting from and in connection with the execution of its work. Geofreeze, as required by the subcontract, purchased a $1 million Comprehensive General Liability policy from Insurance Company of North America (INA), which issued a certificate of insurance to Schlosser, certifying that a $1 million Comprehensive General Liability Policy had been issued on the project.

In July, 1985, Geofreeze began to freeze the earth around the extended area of excavation, and on 5 September 1985 it commenced excavation on the interior. A few days later, large quantities of earth began falling off the wall of the excavation; within a week, the cofferdam was deteriorating to the point that excavation activities temporarily ceased. On 16 September deterioration of the earthen wall posed a threat of lateral collapse to the earth around the frozen wall and to adjacent structures owned by Fairfax County; two days later excavation operations were halted. On 26 September, with the excavation two-thirds complete, total collapse of the earthen cofferdam and surrounding wall appeared imminent with a forecast of the approach of a hurricane to pass over the site within 48 hours. Upon the recommendation of Geofreeze, the excavation was backfilled to avoid a total collapse. Schlosser promptly notified INA of the emergency backfilling.

Schlosser subsequently filed a claim with INA for property damage incurred as a result of the frozen cofferdam's failure and for reimbursement of costs of emergency backfilling and re-excavation. INA denied coverage; Schlosser sued Geofreeze and INA in federal court. The District Court granted INA's summary judgment motion, and Schlosser appealed. Deeming that Maryland law governed

the legal issue involved because Schlosser, the certificate holder of the INA policy, was a Maryland resident, the Fourth Circuit Court of Appeals certified the issue of law to the Maryland Court of Appeals.

The Court recited the principles governing the interpretation of insurance contracts, as set forth in *Cheney v. Bell National Life,* which we quoted, *supra;* then, applying those principles, it held that the INA policy did not provide for recovery of preventative costs. The policy was a contractor's General Liability Policy intended to protect the insured against claims made by others for damages the insured has a legal obligation to pay. There were no claims made by others as a result of any personal injuries or property damage. The action taken by Schlosser was for the purpose of preventing the kind of harm the policy would have covered, but no such harm occurred.

Schlosser argued that even if preventive costs are not damages within the meaning of the policy, principles of fairness, equity, and public policy dictate that the contract be interpreted to afford such coverage. Rejecting that argument, the Court said that it was not persuaded that fairness and equity justify construction of an insurance policy to provide coverage where none exists under the clear language of the policy.

B & L's expenditure of funds to clean up its property may very well have prevented a loss of an even greater sum for which Utica would have been liable. Nevertheless, *Schlosser* holds that preventive costs are not damages within the meaning of a CGL policy, just as *Maryland Cup* holds that cleanup costs incurred to comply with an injunction do not constitute damages within the meaning of such a policy. Based on the reasoning of those cases, we hold that the circuit court erred in awarding B & L a judgment against Utica for the cleanup costs expended by B & L. By the same token, since Utica was under no obligation to defend, indemnify, or reimburse B & L with respect to the claim or potential claim of the State, it breached no duty to defend and its declaratory judgment action was appropriate and

justified. The circuit court also erred, therefore, in granting B & L a judgment for the costs, expenses, and counsel fees it incurred.

JUDGMENT REVERSED AND CASE REMANDED FOR THE ENTRY OF A DECLARATORY JUDGMENT IN CONFORMITY WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE/CROSS–APPELLANT, BAUSCH & LOMB, INC.