727 A.2d 915

**Thomas J. MURPHY, III**

v.

**24TH STREET CADILLAC CORPORATION**
**t/a Chesapeake Cadillac Jaguar et al.**

**No. 95, Sept. Term, 1998.**

Court of Appeals of Maryland.

April 15, 1999.

Kelly A. Koermer; Thomas G. Bodie (Bodie, Nagle, Dolina, Smith & Hobbs, P.A., on brief), Towson, for Petitioner.

Samuel Y. Botts (Veronica R. Hill, Jordan Keys Jessamy & Botts, LLP, on brief), Greenbelt, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CHASANOW, Judge.

This case requires that we address the construction of the remedial provisions of Maryland's Consumer Motor Vehicle Leasing Contracts Act (the Act) for the first time since it was enacted in 1987. Maryland Code (1990 Repl.Vol., 1998 Supp.), Commercial Law Article, § 14–2001 et seq.[1] The Act extends the warranty provisions of Maryland's Automotive Warranty Enforcement Act, § 14–501 et seq., better known as the "lemon law," to automobile leasing arrangements. The petition arises out of an action filed under the Act by Mr. Thomas J. Murphy, III (Mr. Murphy) against 24th Street Cadillac Corporation, t/a Chesapeake Cadillac Jaguar (Chesapeake) and General Motors (GM). Mr. Murphy seeks to invoke the Act's remedial provision requiring a manufacturer to accept return of a leased vehicle and refund monies related to the lease agreement. The primary issue concerns whether Mr. Murphy permitted the defendants the statutorily required "reasonable number of attempts" at repairing the alleged defect. § 14–2004(d)(1)(i). After a bench trial, the trial judge ruled that Mr. Murphy acted unreasonably in not permitting an additional repair attempt. The Court of Special Appeals affirmed. *Murphy v. 24th St. Cadillac,* 121 Md.App. 454, 710 A.2d 332 (1998). For the reasons that follow, we shall affirm the judgment of the trial court, albeit on grounds slightly different than the Court of Special Appeals.

---

1. Unless otherwise indicated, hereinafter all statutory references shall be to Maryland Code (1990 Repl.Vol., 1998 Supp.), Commercial Law Article.

## I.

### A.

Mr. Murphy entered into a lease with Chesapeake on February 26, 1996, for use of a brand new Cadillac STS automobile, covered by a standard warranty, for 24 months. The lease required Mr. Murphy to pay a monthly rate of $930.74. A little over a month into the lease agreement, Mr. Murphy noticed that the vehicle occasionally hesitated during acceleration. In describing the hesitation problem, Mr. Murphy testified that:

> "The best example I can think of is the fact that backing out of my garage, you come up the driveway and it's a little bit of an angle that spans coming up, the car would hesitate. * * * Hesitate to me would be when you put your foot on the gas, it's not smooth going off, it jumped or whatever you want to call it. But you can tell the engine is not performing the way it should."

On April 16, 1996, he returned the car to Chesapeake to have its mechanics check into the hesitation problem. Chesapeake kept the car overnight, but its mechanics were unable to duplicate the hesitation problem after visual inspection and road and computer tests. Chesapeake contacted GM about the condition through a satellite transmission and through its Technical Assistance Center. GM informed Chesapeake that it was coming out with a new computer recalibration chip that might address the hesitation problem that Mr. Murphy said he was experiencing. An invoice introduced into evidence stated: "Unable to duplicate at this time. Cadillac is coming out with a recalibration for this condition." Chesapeake advised Mr. Murphy of its efforts and returned the car.

According to Mr. Murphy's trial testimony, after the initial visit the hesitation problem continued, and he began to encounter a new problem—the car stalled on several occasions when he was stopped or nearly stopped. On three occasions the car stalled at a traffic light, requiring that he put the car's transmission back into the "park" position to restart the engine. On April 24, 1996, per the instructions in the warran-

ty book, Mr. Murphy called GM to report these incidents because, he testified, "with the car simply stopping in the middle of traffic at a light, it became a lot more serious than the simple hesitation problem." GM took note of Mr. Murphy's complaint, but took no immediate action on the problem. Mr. Murphy continued to drive the automobile. On April 28, 1996, while driving Mr. Murphy attempted to turn onto a highway and the car again hesitated. Mr. Murphy testified that, as a result of the hesitation, his car was nearly struck by another. The following day Mr. Murphy took the automobile back to Chesapeake for repair. Chesapeake kept the car for a few days but again was unable to duplicate the problems complained of by Mr. Murphy. A Chesapeake mechanic testified that he did some rewiring of the ignition "in order to satisfy [the customer]," but not because he found anything wrong with the vehicle. After Chesapeake returned the car, Mr. Murphy noticed an improvement for about a ten-day period. In early and mid-May, however, the car stalled again; once while stopped at a light and another time while the car was moving very slowly over a speed bump in a parking lot.

On May 27, 1996, Mr. Murphy called GM again via its "800 number" to report these latest incidents and to ask to be released from the lease. In the first week of June, Mr. Murphy stopped driving the car altogether. At the advice of his counsel, on June 11, 1996, Mr. Murphy called Chesapeake and told them that, although he wanted out of the lease, he would give them one last opportunity to fix the problem with the car. Chesapeake told him that the recalibration chip had arrived and that the repairs could be done if he brought the vehicle in six days later, on June 17, 1996. Mr. Murphy responded that he was not willing to wait six days to have the car repaired and refused Chesapeake's offer. Mr. Murphy then had his attorney inform Chesapeake, via a letter dated June 11, 1996, that he wanted the lease terminated and the car taken back.

Mr. Murphy subsequently maintained his refusal to allow another repair attempt, and he refused GM's offer, on June 27, 1996, to replace the car with another. On July 5, 1996, he

filed his lawsuit, asking that GM accept his return of the Cadillac and for a refund of the money paid for the lease. As the lawsuit proceeded, Mr. Murphy continued making his monthly lease payments though he did not drive the car, but he had someone turn the engine over on occasion. A GM consultant test drove the vehicle before trial and testified at trial that he was unable to duplicate any hesitation or stalling problem.

At a bench trial in the Circuit Court for Baltimore County, Judge Robert E. Cadigan ruled in favor of Chesapeake and GM, finding that "it was unreasonable on the part of Mr. Murphy to not wait that six days to see if Chesapeake could repair this vehicle." Judge Cadigan concluded, therefore, "that Chesapeake was not given a reasonable opportunity to perform the repairs which could have cured this particular problem." The Court of Special Appeals affirmed. *Murphy, supra.* We shall provide more facts about the case and more detail on the trial court's and intermediate court's decisions as they become relevant in the discussion that follows.

### B.

The Consumer Motor Vehicle Leasing Contracts Act comprehensively regulates the leasing of motor vehicles for the protection of lessees. The statute requires lessors of motor vehicles to make certain disclosures at the time leasing arrangements are made and otherwise regulates the contract between the lessee and lessor. § 14–2002. It also protects lessees from unscrupulous marketing practices. § 14–2003. Section 14–2004 is the provision with which the instant case is most concerned. It provides in pertinent part:

"(a) *Applicability of Uniform Commercial Code.*—To the extent that §§ 2–313 through 2–318, inclusive, of this article apply to the purchase of a motor vehicle, the rights and remedies provided for in those sections shall apply to the lease of a motor vehicle and may be exercised by any lessee.

\* \* \*

(c) *Nonconformity, defect or condition—Report.*—(1)(i) If a new motor vehicle does not conform to all applicable warranties during the warranty period, the lessee shall, during the warranty period, report the nonconformity, defect, or condition by giving written notice to the manufacturer, factory branch, or lessor by certified mail, return receipt requested.

\* \* \*

(2) The lessee shall provide an opportunity for the manufacturer or factory branch, its agent or authorized dealer, or the lessor or the lessor's agent to cure the nonconformity, defect, or condition.

(3) The manufacturer or factory branch, its agent or its authorized dealer, or the lessor or the lessor's agent shall correct the nonconformity, defect, or condition at no charge to the lessee, even if repairs are made after the expiration of the warranty period.

(d) *Same—Rights and remedies where manufacturer, factory branch, etc., unable to repair or correct.*—(1)(i) If, during the warranty period, the manufacturer or factory branch, its agent or authorized dealer, or the lessor or the lessor's agent is unable to repair or correct any nonconformity, defect, or condition that substantially impairs the use and market value of the motor vehicle to the lessee after a reasonable number of attempts, the manufacturer or factory branch, at the option of the lessee shall:

1. Replace the motor vehicle with a comparable motor vehicle acceptable to the lessee;  or

2. Accept return of the motor vehicle from the lessee and refund to the lessee all moneys paid by the lessee to repair the defect, condition, or nonconformity pursuant to a lease, including all excise tax, license fees, registration fees, and any similar governmental charges, less a reasonable allowance for the lessee's unimpaired use of the vehicle;  and

* * *

(2)(i)  In the event a manufacturer accepts return of a motor vehicle, under paragraph (1)(i)2 of this subsection, the lessee shall be compensated by the manufacturer for any moneys paid during the period in which the motor vehicle was not available due to the defect, condition, or nonconformity and the lessor shall be paid by the manufacturer all amounts due to the lessor under the terms of the lease.

* * *

(e)  *When presumption that a reasonable number of attempts to conform vehicle to applicable warranties arises.*— It shall be presumed that a reasonable number of attempts have been undertaken to conform a motor vehicle to the applicable warranties if:

(1)  The same nonconformity, defect, or condition has been subject to repair 4 or more times by the manufacturer or factory branch, or its agents or authorized dealers, within the warranty period but such nonconformity, defect, or condition continues to exist;

(2)  The motor vehicle is out of service by reason of repair of 1 or more nonconformities, defects, or conditions for a cumulative total of 30 or more days during the warranty period; or

(3)  A nonconformity, defect, or condition resulting in failure of the braking or steering system has been subject to the same repair at least once within the warranty period, and the manufacturer has been notified and given the opportunity to cure the defect, and the repair does not bring the vehicle into compliance with the motor vehicle safety inspection laws of the State."

Section 14–2004 plays two important consumer protection roles.  First, it expands the warranty provisions of the Uniform Commercial Code, Md.Code (1997 Repl.Vol.) Commercial Law Art., §§ 2–313 through 2–318, to leases of motor vehicles and provides for remedies if those warranties are violated. Second, it provides to lessees of automobiles the protections

found in Maryland's "lemon law," which applies to sales of automobiles. *See* § 14–1502. The lemon law remedies for purchases and leases of defective vehicles differentiate between curable defects and those that cannot be repaired. In the case of curable defects, the lessee is required to allow "an opportunity ... to cure ... at no charge to the lessee." § 14–2004(c)(2–3). Thus, for defects that can be cured, § 14–2004 simply requires that the defect be cured free of charge by the manufacturer, dealer, or lessor.

Subsection 14–2004(d) provides for those situations in which the defect is not subject to correction or remains unrepaired. To take advantage of this subsection, the lessee must demonstrate two elements in addition to the existence of a nonconformity or defect and the notice required under subsection (c). First, the defect must be one that "the manufacturer or factory branch, its agent or authorized dealer, or the lessor or the lessor's agent is unable to repair or correct ... after a reasonable number of attempts." § 14–2004(d)(1)(i). Second, the defect must be one "that substantially impairs the use and market value of the motor vehicle to the lessee." *Id.* If these two facts are proven, the lessee is entitled to chose between two remedies—either replacement of the defective vehicle with a comparable vehicle or a return of the vehicle with a refund of various expenses incurred as a result of the lease, less an allowance for the lessee's unimpaired use of the vehicle. *Id.*

Finally, subsection (e) provides guidance as to what constitutes "a reasonable number of attempts" to repair or correct a vehicle defect or nonconformity under subsection (d). As discussed in more detail below, the subsection operates by shifting the burden of production to the manufacturer or factory branch that the lessee·has not permitted a "reasonable number of attempts" when the lessee establishes any one of three situations. The situations in which the lessee gains the benefit of this presumption, all of which must occur during the warranty period, include: (1) when repair of the defect has been attempted four or more times; (2) when the vehicle has been out of service a cumulative total of 30 or more days for

repairs of one or more defects; or (3) when the defect "result[s] in failure of the braking or steering system," repair has previously been attempted, the manufacturer has been notified and given the opportunity to cure the problem, "and the repair does not bring the vehicle into compliance with the motor vehicle safety inspection laws of the State." § 14–2004(e)(3).[2]

This case concerns Mr. Murphy's attempt to utilize the § 14–2004(d) remedy of ending the leasing arrangement and recovering the costs associated with the lease. As noted above, the statute requires Mr. Murphy to establish that he has allowed a "reasonable number of attempts" to cure the defect. As described next, Mr. Murphy's burden may be ameliorated by subsection (e) if he is able to establish one of the three factual situations giving rise to the presumption.

## II.

### A.

We now turn to the primary point of contention between the parties concerning whether GM was given a "reasonable number of attempts" to cure the defect alleged by Mr. Murphy. Before addressing the specifics of the trial court's ruling, we address Mr. Murphy's and GM's construction of the statutory presumption created under § 14–2004(e), the text of which is quoted above. Mr. Murphy contends that he has demonstrated the elements necessary for the presumption under subsection (e)(3) and as a result that his "reasonableness is presumed as a matter of law (and he is, thus, entitled to a remedy)." For its part, GM argues that subsection (e) creates "require[ments]" that lessees must establish in order to claim a remedy under the Act. For example, referring to the subsection (e)(1) presumption, GM asserts that the statute "permit[s] a manufacturer four attempts in making needed repairs." In addition, GM's statement of the issue presented to this Court

---

**2.** Identical provisions are found in Maryland's lemon law statute. *See* § 14–1502(d).

asks whether the statute "requires the lessee to provide the lessor and manufacturer four attempts to repair a non-conformity or defect in a vehicle in order for the lessee to seek relief."

■ Both Mr. Murphy and GM misconstrue the operation of the presumption created under subsection (e). Subsection (e) does not conclusively determine whether a reasonable number of repair attempts has been permitted but only shifts the burden of production between the lessee and the manufacturer, and the question of reasonableness remains a question of fact. The role of the presumption created under subsection (e) is governed by Maryland Rule 5–301:

> "(a) Effect. Unless otherwise provided by statute or by these rules, in all civil actions a presumption imposes on the party against whom it is directed the burden of producing evidence to rebut the presumption. If that party introduces evidence tending to disprove the presumed fact, the presumption will retain the effect of creating a question to be decided by the trier of fact unless the court concludes that such evidence is legally insufficient or is so conclusive that it rebuts the presumption as a matter of law."

The comments to Md. Rule 5–301 state that the rule was intended to codify Maryland common law on presumptions in civil actions as articulated in this Court's decision in *Grier v. Rosenberg*, 213 Md. 248, 131 A.2d 737 (1957). *See also* Alan D. Hornstein, *The New Maryland Rules of Evidence: Survey, Analysis and Critique*, 54 MD. L. REV. 1032, 1048–49 (1995). In *Grier*, we addressed a trial court's refusal to instruct the jury of the presumption that, if the jury believed the evidence that the defendant was the owner of the car involved in an accident, there arose a rebuttable presumption that the automobile was being operated by the owner, the owner's agent, or employee and within the scope of employment. We reversed, holding that the jury should have been told of the presumption.

We explained in *Grier* that there were three possible outcomes when the substantive law creates a presumption and

the trier of fact finds the presumption applicable. *Grier*, 213 Md. at 254–55, 131 A.2d at 740. Each scenario depends on the evidence presented by the party against whom the presumption operates (and whom we shall call the "defendant"). Under the first scenario, if the defendant does not present any evidence, or the evidence is so slight that it is insufficient to submit to the jury, then the presumption operates conclusively as to the fact presumed. In such a case, the plaintiff may be entitled to a directed verdict or an instruction that if the fact finder finds the facts that give rise to the presumption, then it must find for the plaintiff on that issue. If, on the other hand, the defendant presents conclusive evidence rebutting the presumption, the burden of production may shift back to the plaintiff, in which case if the plaintiff fails to produce reply evidence, the defendant may be entitled to a directed verdict. The final and perhaps most likely scenario occurs when the defendant produces some evidence, neither insufficient nor conclusive, rebutting the presumption. In this scenario, the existence of the presumed fact is submitted to the fact finder that is informed of the presumption. *See also* LYNN McLAIN, 5 MARYLAND EVIDENCE § 301.2, at 89–90 (1995 supp.).

We recently applied Md. Rule 5–301 in *Carrion v. Linzey*, 342 Md. 266, 675 A.2d 527 (1996), holding that the jury was properly informed of the presumptive correctness of an arbitration panel's award in a medical malpractice lawsuit. At issue was the presumption created by Md.Code (1974, 1995 Repl.Vol.), Courts & Judicial Proceedings Art., § 3–2A–06(d) of the Health Claims Arbitration Act that a decision of the arbitration panel is presumptively correct. After exploring the reasons behind the presumption, we explained that in litigation subsequent to an arbitration panel ruling "the party challenging the decision of the arbitration panel has the burden of producing evidence tending to disprove the panel's decision. Once this burden of production is met, the presumption retains enough vitality so that, without any other evidence, the party that prevailed at the panel can get to the jury." *Carrion*, 342 Md. at 287, 675 A.2d at 537.

## B.

The presumptions created under § 14–2004(e) address the factual question of what constitutes a "reasonable number of attempts" to repair a vehicle defect. Unlike the presumptive correctness of an arbitration proceeding in *Carrion*, a party seeking the benefit of a § 14–2004(e) presumption must first establish one of the three factual situations. When any one of these three situations is shown, the remedial purposes of the Act are furthered by shifting the burden to the manufacturer of producing evidence rebutting the presumption that a reasonable number of attempts at repair had been allowed. In proving the existence of the facts necessary to gain the benefit of the presumption (*e.g.*, that there have been four unsuccessful repair attempts), the lessee's initial burden of production is met, and the fact finder must find that a reasonable number of attempts has occurred unless rebuttal evidence is produced tending to show that a reasonable number of repair attempts has not been permitted. If rebuttal evidence is produced, the court must determine which of the three situations discussed in *Grier* is present: (1) whether the rebuttal evidence is so insufficient as a matter of law as to not allow it to be presented to a jury, (2) whether it is so conclusive as a matter of law as to eliminate the benefit of the presumption, or (3) whether the question is one for the trier of fact taking into account the presumption and hearing the rebuttal evidence. On the other hand, if the facts do not give rise to one of the three situations in subsection (e), the subsection (e) presumption does not arise and the burden of production remains with the lessee, in which case the trier of fact still must evaluate whether the lessee has produced sufficiently persuasive evidence that there has been a reasonable opportunity to repair the vehicle.

■ Thus, contrary to GM's contention, subsection (e) does not establish minimum requirements that must be met before a lessee may seek a remedy under the Act; nor does subsection (e)(1) "permit" GM four attempts to cure a defect. Rather, if the lessee has not permitted four attempts or met the

criteria of either of the two other situations described in subsection (e), the burden of producing evidence that GM has had a reasonable number of attempts to cure remains with the lessee. In other words, the subsection (e) presumption serves only to ease the lessee's burden when the lessee can establish the predicate facts of one of the three situations delineated in the subsection, but the lessee also may show that a reasonable number of repair attempts has been permitted without the benefit of the presumption. Therefore the factual scenarios evident in the subsection (e) presumptions do not establish minimum requirements that a consumer must establish to invoke the statutory remedies. Indeed, one commentator has warned of the potential "danger that the presumptive reasonable number of attempts set in the lemon laws will become a minimum that the consumer will have to allow before the consumer will be permitted refund or replacement under a lemon law." Jean Braucher, *An Informal Resolution Model of Consumer Product Warranty Law,* 1985 WIS. L.REV. 1405, 1438 n. 193 (1985). Finally, even if the lessee establishes the requisite facts to gain the benefit of a subsection (e) presumption, the manufacturer may argue that it has not had a reasonable number of attempts to repair the defect, although it bears the burden of producing evidence to support its argument. As a result, Mr. Murphy's argument that if one of the three situations in subsection (e) is established, reasonableness is "presumed as a matter of law" and the lessee is "entitled to a remedy" is flawed, even assuming that the other requirements for invoking a remedy under subsection (d) are met.

In addition to being consistent with the express language of the statute, our construction of subsection (e) gives proper deference to the fact finder's task of determining the reasonableness of the number of repair attempts by accounting for the myriad of circumstances that arise when someone has vehicle problems. Questions of reasonableness are ordinarily for the trier of fact because it accounts for the circumstances of the individual case and the credibility of the witnesses and evidence presented at trial. *See, e.g., Informed*

*Physician v. Blue Cross,* 350 Md. 308, 332, 711 A.2d 1330, 1342 (1998)(observing that " '[w]hat will constitute reasonable efforts . . . is largely a question of fact' "), quoting *Allview Acres v. Howard,* 229 Md. 238, 244, 182 A.2d 793, 796 (1962); *Wilson v. Morris,* 317 Md. 284, 295, 563 A.2d 392, 397 (1989)(noting that issue of reasonableness is for the jury); *Lynx, Inc. v. Ordnance Products,* 273 Md. 1, 13, 327 A.2d 502, 512 (1974)(what constitutes a "reasonable time" is ordinarily a question of fact).

This interpretation of the interplay between the requirement of a reasonable number of repair attempts and the presumption created by subsection (e) is consistent with the interpretations other states have given similar provisions in their lemon laws. For example, we agree with the view of the California court, which in analyzing the similarly worded California lemon law statute, said that even with the presumptions

"[t]he issue of whether the manufacturer has made a reasonable number of attempts to conform the product to the warranty remains to be resolved. Unreasonableness may still be found even if a new vehicle has been out of service for less than 30 days or if there have been fewer than four attempts to repair the same problem. By enacting subdivision (e) the Legislature has not decreed a per se, valid-in-all circumstances, money-back guarantee for every purchaser whose new automobile has spent 30 days at the dealership for repairs, or who has suffered through four attempts to fix a problem; these are only markers on the path of reasonableness that the trier of fact must trod."

*Ibrahim v. Ford Motor Co.,* 214 Cal.App.3d 878, 263 Cal.Rptr. 64, 68 (1989). *See also Ford Motor Co. v. Texas Dept. of Transp.,* 936 S.W.2d 427, 432 (Tex.Ct.App.1996)("[T]he existence of statutory presumptions does not forbid the agency from finding that different circumstances or fewer attempts meet the requisite 'reasonable number of attempts.' "). In *Subaru of America, Inc. v. Peters,* 500 S.E.2d 803 (Va.1998), the Supreme Court of Virginia addressed the argument by Subaru—identical to the interpretation of subsection (e) made

by General Motors in this case—that Virginia's presumption that three attempts at repair constituted a "reasonable number of attempts" allowed it, as a matter of law, a minimum of three attempts at repair. VA.CODE ANN. § 59.1–207.13B (Michie 1998). In rejecting Subaru's argument and affirming a jury's finding that a reasonable number of attempts had been allowed, the court said:

> "The case was not submitted to the jury on the presumption. Instead, the jury was instructed on the provision ... of the statute requiring replacement of the vehicle or refund of the purchase price if there was a failure to conform the vehicle to the warranty 'after a reasonable number of attempts during the lemon law rights period.'
>
> The evidence was sufficient to allow the jury to find, without the benefit of the presumption, that the defendant or its agents were afforded a reasonable number of attempts to conform the vehicle...."

*Subaru of America, Inc.*, 500 S.E.2d at 806–07. *See also General Motors Corp. v. Dohmann*, 247 Conn. 274, 722 A.2d 1205, 1211 (1998)(affirming fact finder's conclusion that purchaser's allowing of only one attempt at correcting vehicle's paint defect was enough to constitute a "reasonable number of attempts" under Connecticut lemon law statute containing a presumption similar to § 14–2004(e)).

In sum, while the burden of producing evidence may be shifted depending on whether the lessee can demonstrate one of the three factual predicates necessary to gain the benefit of a subsection (e) presumption, the question of whether there has been a reasonable number of repair attempts may still depend on the trier of fact's assessment of the evidence presented to rebut the presumption.

## C.

As the previous discussion demonstrates, in most cases, the reasonableness of the number of repair attempts will be resolved by the trier of fact whether or not the subsection (e) presumption applies. The appropriate standard

of review on appeal of a trial court's determination of whether a reasonable number of repair attempts has occurred under § 14–2004(d) is found in Md. Rule 8–131(c):

> "*Action tried without a jury.* When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."

We have consistently interpreted the clearly erroneous standard to require the appellate courts to "consider the evidence produced at trial in a light most favorable to the prevailing party." *Geo. Bert. Cropper, Inc. v. Wisterco,* 284 Md. 601, 620, 399 A.2d 585, 595 (1979). So long as substantial evidence is presented to support the trial court's determination, the appellate court is bound by the trial court's factual findings and they will not be disturbed on appeal. *Id; Ryan v. Thurston,* 276 Md. 390, 391–92, 347 A.2d 834, 835–36 (1975); *Delmarva Drilling Co. v. Tuckahoe,* 268 Md. 417, 424, 302 A.2d 37, 40 (1973). "The trial court is not only the judge of a witness' credibility, but is also the judge of the weight to be attached to the evidence." *Thurston,* 276 at 392, 347 A.2d at 836.

In the present case we are required to affirm the factual finding of the trial court that Mr. Murphy did not provide the lessor or General Motors a reasonable number of repair attempts as long as substantial evidence in the record supports its findings. We may not substitute our judgment or interpretation of the facts for that of the trial court so long as those conclusions are supported by the evidence, regardless of whether this Court would arrive at the same factual conclusion based on the evidence presented.

### III.

In his oral opinion, Judge Cadigan found that Mr. Murphy had not provided GM a reasonable opportunity to cure the alleged defect because of his refusal to bring his car to the

dealer six days after he called on June 11, 1996. Judge Cadigan stated:

> "This Court finds it was unreasonable on the part of Mr. Murphy to not wait that six days to see if Chesapeake could repair this vehicle. Accordingly, the Court finds that Chesapeake was not given a reasonable opportunity to perform the repairs which could have cured this particular problem. The statute requires that the dealer be given a reasonable number of attempts to undertake to conform the motor vehicle to the applicable warranties under 14–2004[ (d) ] and the Court finds that it was Mr. Murphy, instead, [who] chose to continue to obligate himself on the lease through March of 1998 rather than take advantage of an offer to repair the car within the six days after his call to Chesapeake."

The trial court's ruling makes clear its factual determination that Mr. Murphy failed to provide a reasonable opportunity to repair the alleged defect. The ruling is less clear, however, as to whether Mr. Murphy was given the benefit of the § 14–2004(e)(3) presumption covering defects resulting in the failure of the braking or steering system. Mr. Murphy contends that the trial court denied him the benefit of the § 14–2004(e)(3) presumption and that such denial constitutes reversible error.

■ We believe that the trial court's ruling can be interpreted in two ways. First, the trial court could have given Mr. Murphy the benefit of the § 14–2004(e)(3) presumption but concluded that GM had presented sufficient evidence to rebut the presumption of reasonableness. Second, the trial court may have denied Mr. Murphy the subsection (e)(3) presumption. As explained in more detail next, substantial evidence in the record supports either finding, and thus there is no reversible error.

### A.

Mr. Murphy may have benefitted from the § 14–2004(e)(3) presumption because either (1) the trial court, correctly or incorrectly, believed he had established the necessary factual

predicate under that subsection to gain the benefit of the presumption; or (2) the trial court assumed, for argument's sake, that Mr. Murphy was entitled to the presumption. Assuming that Mr. Murphy did receive the benefit of the presumption, in order to arrive at its conclusion the trial court would have had to find that GM had produced enough evidence to rebut the § 14–2004(e)(3) presumption that Mr. Murphy had allowed a reasonable number of repair attempts. Applying the clearly erroneous standard of review, we conclude that the evidence in the record could have supported the factual conclusion that GM had rebutted the presumption of § 14–2004(e)(3).

GM presented evidence demonstrating the difficulty of ascertaining the hesitation and stalling problems to which Mr. Murphy testified. GM was never able to replicate Mr. Murphy's problem either before suit was filed or when it examined the automobile for purposes of this lawsuit. George Stoner, a shop foreman for Chesapeake who twice attempted to satisfy Mr. Murphy's complaints of hesitation (and once for the stalling complaint), consistently testified as to his inability to "duplicate the hesitation" and that he "could find nothing wrong" after two attempts at diagnosis. John Tedder, a GM witness, testified to his road test of the car after it sat unused for about a year (though apparently the engine had been started up occasionally). Tedder testified that he "did not at any time encounter any stall, hesitation, misfire conditions."

For his part, Mr. Murphy described the hesitation problem in his testimony. He stated that "when you put your foot on the gas, it's not smooth going off, it jumped or whatever you want to call it. But you can tell the engine is not performing the way it should." *See* Part I.A., *supra*. After he took the car in to be serviced the first time, Mr. Murphy testified that while he was stopped at a red light, "the light turned green, [and] the car completely stopped. I had to put the car in park, start up the engine again and continue forth." Mr. Murphy testified to two other similar stalling occurrences at red lights with intervals in between of ten days to two weeks. The day before he took the car in for the second repair

attempt, Mr. Murphy testified that he was "trying to go into traffic on Belair Road.... I hit the accelerator. The car hesitated to the point where I was almost struck." After the second repair, Mr. Murphy testified that the car stalled at a light and then once again when he was in a parking lot driving slowly over a speed bump. It was after this stall that Mr. Murphy refused to allow another repair attempt.

■ As explained above, in reviewing a trial court's factual findings we must "consider the evidence produced at trial in a light most favorable to the prevailing party." *Geo. Bert. Cropper, Inc.*, 284 Md. at 620, 399 A.2d at 595. The evidence described above and considered in the light most favorable to GM would have permitted the fact finder to conclude that GM successfully rebutted the presumption and that a reasonable number of repair attempts had not been permitted. The trial court, sitting as the fact finder, could have properly attached significant weight to GM's testimony relating to the difficulty in reproducing the alleged defect, and it could have viewed the problems to which Mr. Murphy testified as having less weight. Aside from occasional hesitation and an occasional stall, Mr. Murphy was able to transport himself in his vehicle. The trial court could have concluded that the complaint was one of flawed performance, not a failure of performance or a defect that made the car unusable or unusually dangerous. More-over, the vehicle stalling to which Mr. Murphy testified all occurred when he was beginning to move from a stopped position at a traffic light (or in one case when he was driving very slowly over a speed bump), which the trial court could have found ameliorates any danger involved. Indeed, the only testimony as to Mr. Murphy's perception of being endangered by the vehicle's performance related to its *hesitation*, not stalling (in which case the braking and steering systems were fully operational).[3] The problems faced by Mr. Murphy were

---

**3.** The Court of Special Appeals stated that the "danger presented by the defect was clearly quite severe." *Murphy v. 24th St. Cadillac*, 121 Md.App. 454, 466, 710 A.2d 332, 338 (1998). The trial court, however,

assuredly inconvenient and frustrating, but the trial court's ruling does not require Mr. Murphy to remain inconvenienced and frustrated but only to provide a reasonable opportunity to fix the problem, in this case by waiting six days for an appointment to have the car serviced.

We cannot say it was clear error on the part of the trial judge to conclude that Murphy failed to provide a reasonable number of attempts to repair when he refused to bring the car in six days after his June 11, 1996, phone call.

### B.

As Mr. Murphy contends, the trial court may not have given him the benefit of the subsection (e)(3) presumption in determining whether he had allowed a reasonable number of repair attempts. Assuming the presumption was denied, we conclude based on the facts in the record and our reading of the statute that such a denial would have been proper. To determine whether Mr. Murphy presented sufficient evidence we must parse the text of subsection (e)(3). Subsection (e)(3) makes the presumption available to the lessee when:

"[a] nonconformity, defect, or condition resulting in failure of the braking or steering system has been subject to the same repair at least once within the warranty period, and the manufacturer has been notified and given the opportunity to cure the defect, and the repair does not bring the vehicle into compliance with the motor vehicle safety inspection laws of the State."

Subsection (e)(3) requires a lessee to establish by a preponderance of evidence the existence of five predicate facts before gaining the benefit of the presumption: (1) a defect, (2) the defect must result in the failure of the braking or steering system, (3) the defect must have been subject to at least one repair during the warranty period, (4) the manufacturer must have been notified and given at least one opportunity to cure,

never made any determinations of fact relating to the existence of a defect or the severity of danger.

and (5) the repair must have failed to bring the vehicle into compliance with the state safety inspection laws. For purposes of this discussion, we shall assume, *arguendo,* the existence of elements (1), (3), and (4) and focus on elements (2) and (5).

The text of elements (2) and (5) demonstrate that the purpose of the subsection (e)(3) presumption relates to the legislature's concern about requiring lessees to continue driving unsafe vehicles, specifically those vehicles inflicted with failures of the braking or steering systems.[4] In the instant case, the record overwhelmingly demonstrates that the problems complained of by Mr. Murphy only tangentially related to failures of the braking or steering systems. Moreover, the anecdotal testimony of Mr. Murphy relating the circumstances of the hesitation and stalling problems, viewed in the light most favorable to the prevailing party, GM, did not raise significant safety concerns and therefore did not implicate the purpose of subsection (e)(3). In the one instance in which Mr. Murphy testified as to nearly being hit, he stated, "The car hesitated to the point where I was almost struck." The danger to which Mr. Murphy testified to here did not arise out of a failure of the braking or steering system and so does not affect the applicability of the subsection (e)(3) presumption.

"[Mr. Murphy's Counsel]: In these instances when the motor cut off or died, did you have power in the car to steer?

[Mr. Murphy]: Most certainly did not.

[Mr. Murphy's Counsel]: Did you have power in the car to brake?

[Mr. Murphy]: No, I did not."

This testimony does not apply to the only circumstance to which he testified to being in danger, since that circumstance—to the extent that the fact finder was persuaded that

---

**4.** Instead of using a braking or steering defect presumption, other states with similar lemon law statutes create a presumption for "a serious safety defect [that] has been subject to repair one or more times." VA.CODE ANN. § 59.1–207.13.B.2 (Michie 1998).

there was a significant danger—involved vehicle *hesitation* and not vehicle *stalling,* in which case Mr. Murphy did not lose power to the brakes or steering. Moreover, as described in Part III.A, *supra,* the stalling to which Mr. Murphy testified to occurred only when Mr. Murphy was stopped at a traffic light (or barely moving, as in the case of the speed bump), in which case the finder of fact could have found little safety risk (and, in fact, none was testified to, however inconvenient the stalling may have been).

The evidence introduced at trial also demonstrates that Mr. Murphy's complaints to the dealer and manufacturer involved the engine's performance and not failure of the braking and steering system. The dealership invoices that describe the nature of the problems for which the car was brought in for repair, for example, state: "CK. FOR BAD HESITATION ON ACCEL. WHEN COLD," "ENGINE STALLS WHEN SITTING IN TRAFFIC MAINLY COLD," and "CK. FOR BAD HESITATION ON ACCEL 45 TO 50 MPH." At best, the defect alleged by Mr. Murphy is one that only secondarily implicated the brake and steering system and one which the fact finder could easily have concluded did not raise significant safety issues arising out of brake or steering failure.

There was also little testimony on which the trier of fact could have based a finding of a braking or steering system defect. Mr. Murphy testified briefly to a loss of "power" to the braking and steering systems in the only testimony relating to the braking or steering system. The Cadillac STS, like other cars with power steering and power brakes, has mechanical backup systems that continue to operate if the engine loses power. As the section on steering in the Cadillac STS Owner's Manual states: "If you lose power steering assist because the engine stops or the system is not functioning, you can steer but it will take much more effort." Although there is nothing in the record on the Cadillac STS's braking system, oral argument made clear that the Cadillac, like most new cars, was equipped with power brakes, which similarly have a mechanical backup in case of engine failure. That the backup systems would have operated even when the vehicle stalled

raises the statutory interpretation question of whether such a loss of "power" to those systems constitutes a "failure" of the systems under subsection (e)(3) when the *mechanical* braking and steering systems remain fully functional. We need not resolve that question to dispose of this case. The only evidence presented with respect to the alleged failure of the braking and steering systems was Mr. Murphy's testimony involving *power* to those systems. More evidence would be necessary to establish the tenuous link between vehicle hesitation and stalling while the vehicle is stopped and the driver's ability to safely utilize the steering and braking systems. To adopt Mr. Murphy's argument in this case in effect would be to hold, as a matter of law, that every time a car stalls and is serviced once for that stall, the requirements of subsection (e)(3) are met and the presumption arises, regardless of the safety implications. This we decline to do.[5]

A final reason that the trial court could have appropriately found the presumption arising under subsection (e)(3) inapplicable is the lack of any evidence regarding the fifth factual element that must be shown under subsection (e)(3). This element requires that the repair attempt have failed to "bring the vehicle into compliance with the motor vehicle safety inspection laws of the State." § 14–2004(e)(3). Mr. Murphy produced no evidence nor argued at trial that the Cadillac was ever in a state of noncompliance with the motor vehicle safety laws, much less that Chesapeake's repair attempts did not bring the car back into compliance. The trial court could have

---

5. We also decline to adopt GM's position that, under subsection (e)(3), the defect must be *in* the braking or steering system, as opposed to one affecting either of those systems. The text of subsection (e)(3) contradicts GM's contention in referring to a "nonconformity, defect, or condition *resulting in* failure of the braking or steering system." (Emphasis added). If the facts in this case, for example, were that the car stalled not when stopped at a light but while traveling on the highway at 65 miles per hour, and the fact finder was convinced by the evidence that the mechanical braking and steering systems could not safely be operated under such circumstances, the trial court might properly conclude that the subsection (e)(3) presumption should apply, assuming the other requirements described in the main text are met.

decided on this ground alone that the requirements of subsection (e)(3) had not been met.

## IV.

Since the trial court limited its finding to the question of whether a reasonable number of repair attempts had been allowed, the trial court did not make any factual determinations as to whether Mr. Murphy had proved the other elements set forth in § 14–2004(d) that must be established in order to get a refund of the lease agreement. As discussed above, besides a reasonable number of repair attempts, Mr. Murphy was required to establish the requisite notice,[6] the existence of a defect, and that the defect substantially impaired the use and market value of the motor vehicle to Mr. Murphy. Additionally, in order to gain the benefit of the § 14–2004(e)(3) presumption, Mr. Murphy must prove that the *"manufacturer* has been ... given the opportunity to cure the defect." (Emphasis added). Since the trial court found that Mr. Murphy had not proven the requirement of a reasonable number of repair attempts, it had no need to address the other requirements. Similarly, although they were raised in this petition, these issues are unnecessary for us to resolve since we affirm the trial court's finding that GM had not been afforded a reasonable number of repair attempts.

Nevertheless, we find it necessary to address the Court of Specials Appeals' treatment of two of those requirements. First, as noted in footnote 3, we do not interpret the trial court as necessarily concluding that there was a defect with Mr. Murphy's car. *See Murphy,* 121 Md.App. at 466, 710 A.2d at 338. Although in his oral opinion Judge Cadigan did refer to the "particular problem" of the vehicle and spoke of its "repair," he did so in discussing whether a reasonable number

---

6. Although GM had actual notice of Mr. Murphy's complaints about his car, Mr. Murphy did not send a certified letter to GM until after he had refused to have the car serviced again. *See* § 14–2004(c). Given GM's waiver of the notice requirement, we do not address whether actual notice suffices under the statute in lieu of § 14–2004(c) requiring notice by "certified mail, return receipt requested."

of repair attempts had been permitted. He never explicitly addressed the existence or nonexistence of a defect. We interpret his holding as assuming the existence of a defect but finding against Mr. Murphy for not meeting his burden of persuasion as to allowing a reasonable number of repair attempts. Therefore, we disagree with the language in the intermediate appellate court's decision labeling the problems complained of by Mr. Murphy as relating to a vehicle "defect."

Secondly, GM argued, and the intermediate appellate court agreed, that although its authorized dealer was afforded an opportunity to address Mr. Murphy's complaints, GM as the manufacturer was never afforded such an opportunity, which is required in order for a lessee to gain the presumption in subsection (e)(3). The Court of Special Appeals concluded that GM's recalibration chip, which would have been installed in Mr. Murphy's vehicle had he been willing to wait six days, would have been GM's *first* opportunity to repair. *Murphy,* 121 Md.App. at 464, 710 A.2d at 337. Once again, however, we interpret the trial court's order as not deciding whether GM the manufacturer was given such an opportunity; rather, the trial court ruling gave Mr. Murphy the benefit of any doubt as to whether an attempt by Chesapeake constituted an attempt by GM. Judge Cadigan concluded that *"Chesapeake* was not given a reasonable opportunity to perform the repairs." Since Chesapeake had not been given a reasonable opportunity to repair the problem, *a fortiori* under the facts GM could not have been given a reasonable opportunity to repair. The finding that Chesapeake was unreasonably denied another repair attempt necessarily implies that GM also did not have sufficient opportunity to repair the problem, regardless of whether an attempt by Chesapeake also constituted an attempt by GM. Moreover, GM's argument is only relevant for purposes of the subsection (e)(3) presumption, since subsection (d) explicitly states that the repair attempts may be performed by "the manufacturer or factory branch, its agent or authorized dealer, or the lessor or the lessor's agent."

Furthermore, the record is undisputed in showing that (1) Mr. Murphy followed GM's warranty instructions, (2) Mr.

Murphy called GM on its 800 number and was told to take his vehicle to Chesapeake, (3) Mr. Murphy's Cadillac was electronically connected to GM's own facilities through GM's CADSTAR computer program, and (4) Chesapeake's service personnel spoke with GM's technical assistance personal in order to diagnose the problem. Indeed, a Chesapeake mechanic testified that GM's CADSTAR program "told" him how to reroute certain wires in an effort to address the problems Mr. Murphy complained of.

GM maintains that despite these facts it was never given an opportunity to fix the problems Mr. Murphy complained of and that Chesapeake was not its agent for purposes of repair.[7] As a practical matter, Mr. Murphy pursued his problems exactly as GM wished, and it would seem to defeat the purpose of the consumer protection statute to allow GM to escape responsibility by arguing that it never had a chance to repair the vehicle after it had consistently advised Mr. Murphy that Chesapeake would handle the repairs. *Cf. Levine v. American Motors Corp.*, 134 Misc.2d 1088, 514 N.Y.S.2d 608, 610 (N.Y.Sup.Ct.1987)(rejecting manufacturer's argument that its authorized dealer was not its agent for purposes of lemon law statute requiring the "manufacturer" to " 'accept return of [defective] vehicle' " because consumer pursued "the most effective means of accomplishing a return")(quoting in part from New York's General Business Law § 198–a). Nevertheless, even though GM's denial seems somewhat implausible in light of the facts presented, our holding in this case does not require us to address this question, and our ruling therefore

---

**7.** As to its contention that Chesapeake was not its agent for the purposes of attempting to repair Mr. Murphy's vehicle, GM cites *Mercedes–Benz v. Garten*, 94 Md.App. 547, 618 A.2d 233 (1993). Even if we were to agree that *Garten* was correctly decided, we would question its applicability to this case. The agency issue in *Garten* involved whether a statement by a dealer's salesperson could be used as a basis for an action against a manufacturer alleging breach of an express warranty under the commercial code. The issue here, on the other hand, involves whether GM, either on its own or through Chesapeake, had an opportunity to repair the vehicle.

does not address this aspect of the Court of Special Appeals' decision.

## V.

Our resolution of this petition ultimately turns on the narrow question of whether we are able to affirm, under the clearly erroneous standard, the trial judge's factual finding that Mr. Murphy had not permitted a reasonable number of repair attempts. The presumptions created under § 14–2004(e) do not alter the factual nature of the trial court's finding. Substantial evidence in the record supports the trial court's factual finding whether the trial court gave or refused to give Mr. Murphy the benefit of one of the § 14–2004(e) presumptions. Having found no clear error, we must affirm.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.**