862 A.2d 1042

**Charles D. LOHMAN, et al.**

v.

**John C. WAGNER, et. al.**

**No. 2185, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Sept. 30, 2004.

Reconsideration Denied Dec. 6, 2004.

William McC. Schildt, Jason Morton (Strite and Schildt, on brief), Hagerstown, for appellant.

Ernest I. Cornbrooks, III (Webb, Burnett, Jackson, Cornbrooks, Wilber, Vorhis & Douse, LLP, on brief), Salisbury, for appellee.

Panel MURPHY, C.J., BARBERA, MEREDITH, JJ.

MEREDITH, J.

This case involves a suit for an alleged breach of contract concerning the sale of weaner pigs. The term "weaner pigs" refers to young pigs in the developmental stage from the time of their birth until they are weaned from their mothers at a weight of seven to fourteen pounds, after which they are known as "feeder pigs" until they reach a weight of 50 pounds. Appellant, Charles D. Lohman, trading as Lohman Farms, filed a complaint in the Circuit Court for Washington County against Appellees, John C. Wagner and Joyce E. Wagner, trading as Swine Services. The complaint alleged the breach of a "Weaner Pig Purchase Agreement" between the parties. After a three-day bench trial, the trial judge entered judgment for the defendants. The trial court found that the alleged contract did not meet the requirements of the UCC statute of frauds (Md Code (1957, 2001 Replacement Volume), Commercial Law Article, § 2–201), and that the alleged agreement was not enforceable against the Wagners. Lohman appealed. We shall affirm the judgment entered by the trial court.

## Questions Presented

Lohman raises three contentions in this appeal:

1. That the trial court erred in concluding the Maryland Uniform Commercial Code applies to the Weaner Pig Purchase Agreement;

2. That the trial court erred in concluding a quantity term was required to be stated in the Weaner Pig Purchase Agreement in order for that agreement to be enforceable under Commercial Law Article, § 2–201;

3. That the trial court erred in concluding the Weaner Pig Purchase Agreement did not contain a quantity term and, therefore, was not an enforceable contract under Commercial Law Article, § 2–201.

We agree with the trial court that the alleged contract contemplated the sale of goods, and that the Maryland Uniform Commercial Code therefore applies. We further agree with the trial court that § 2–201 of the Commercial Law

Article requires a quantity term to be included in a writing signed by the party to be charged. Having considered the evidence in a light most favorable to the prevailing party, as required by Maryland Rule 8–131(c) and cases applying the "clearly erroneous" standard of appellate review, *see, e.g., Murphy v. 24th Street Cadillac Corp.*, 353 Md. 480, 497, 727 A.2d 915 (1999), we affirm the trial court's finding that there was no writing that satisfied the requirements of Commercial Law Article, § 2–201.

## Background

Prior to 1998, Lohman operated a "farrow to finish" pig raising operation at his farm in Washington County. A "farrow to finish" pig operation involves the breeding, gestation, and raising of pigs to a weight of 50 pounds so that they can be transferred to a finishing floor, where they continue to mature until they reach a market weight of 250 to 300 pounds.

Lohman knew John Wagner because of Wagner's longtime involvement in various aspects of the pork industry. In approximately December 1997, Lohman contacted Wagner and asked if Wagner knew of any business opportunities for Lohman. Wagner responded that Lohman's timing was good because Wagner was in the process of putting together a network of pork producers and buyers. Lohman and Wagner met numerous times and had a number of telephone conversations concerning Lohman becoming a weaner pig producer for the pork network being proposed by Wagner.

By January 1998, Lohman had decided he wanted to convert his farrow to finish operation into a weaner pig facility. This would entail remodeling his building to provide for more gestation space, reducing his feeder pig inventory, and increasing the number of sows he maintained. Lohman began the conversion process by selling his feeder pigs.

In May or June 1998, Lohman began selling weaner pigs to Wagner even though Lohman had not yet remodeled his barn to accommodate an operation that was exclusively devoted to

producing weaner pigs. Wagner's pork network was still not in place.

In July 1998, Lohman sought financing from First National Bank of Mercersburg to fund the remodeling of his facility. Wagner testified that Lohman contacted him at home on a Friday or Saturday night in July, and that Lohman had asked Wagner to give him a sample copy of a weaner pig purchase agreement that the pork network would be using. According to Wagner, he did not have any sample agreements for the weaner pig operation at that time because Wagner's contemplated network of pork purchasers was still not ready to enter into contracts. Lohman told Wagner that he was meeting with his banker the next day and needed something to show his banker. Wagner testified as follows:

He [Lohman] called me at home.... And said he needed something to show to his banker that he was trying to get financing for the remodeling. And I didn't have anything, but ... I found an old one ... from one of my files and ... I think my wife actually retyped it and put together what we were calling a sample or a draft of what, what it would look like when we were ready to put a true network agreement together....There seemed to be some urgency ... so we put one together and faxed it to Mr. Lohman....

There were several blank lines in the document that Wagner faxed to Lohman, but Wagner nevertheless had signed the document on the signature line for the purchaser. The fax cover sheet said: "Dear Charlie, I trust this will help you in securing financing as we had discussed."

Wagner testified that after he faxed the document to Lohman, "I never saw it again and really wasn't expecting to see it because it was simply a draft or a sample." When asked if he had intended the faxed sample of a weaner pig purchase agreement to be a contract with Lohman, Wagner testified, "It was strictly a sample or a draft of what we were going to be using.... No this was not the contract."

Lohman admitted that he filled in several blanks on the document he received from Wagner. Most significantly, there

was a blank line for the number of pigs to be supplied and purchased under the agreement. The document as faxed by Wagner read: "PRODUCER agrees to ... supply approximately _____ weaner pigs weekly." Without having any further communications with Wagner, Lohman inserted the quantity "300" as the approximate number of weaner pigs to be supplied weekly. Although Lohman signed his copy of the agreement as "Producer" and faxed a copy to his bank, it was undisputed that he never sent Wagner a copy of the agreement containing his handwritten alterations.

Lohman became a producer exclusively of weaner pigs in July 1998 and continued shipping weaner pigs to Wagner at $28 per head. This price was consistent with the pricing schedule contained in the weaner pig purchase agreement that Wagner had faxed to Lohman.

Lohman shipped weaner pigs to Wagner at $28 per head until October 1998, when Lohman received a telephone call from Wagner about a price decrease. Wagner said he needed to reduce the price to $18 per head because of an extreme drop in market prices for pork. When Lohman responded that this price reduction would probably put him out of business, Wagner told Lohman he would see what he could do, but Wagner never offered to pay Lohman any higher price after October 1998.

Lohman continued selling pigs to Wagner at $18 per head until March 1999, when Lohman wound down his business. During this time, Lohman attempted to find another buyer for his pigs, but was unable to do so. Lohman acknowledged that prior to filing suit he never told Wagner he believed Wagner breached their agreement. Wagner's pork network never came into being.

Lohman filed a one-count complaint against the Wagners, alleging breach of contract and seeking damages.

## I. Goods and Services

Lohman asserts that the trial court erred in finding the Maryland Uniform Commercial Code applies to the alleged

contract in this case. Lohman contends the agreement with Wagner was a contract for the provision of services, not a contract for the sale of goods, and therefore, the UCC does not apply. Lohman argues that the language of the agreement "was carefully crafted to avoid a sales transaction" by requiring the "Producer" (Lohman) to furnish housing facilities, labor, utilities, and production supplies in producing and raising weaner pigs. Additionally, Lohman notes that the agreement gave Wagner the authority to access Lohman's facility and to oversee various aspects of breeding and raising the pigs. Lohman contends the agreement is therefore one for the provision of services by him, and not a contract for the sale of weaner pigs.

In *DeGroft v. Lancaster Silo Co., Inc.*, 72 Md.App. 154, 164, 527 A.2d 1316 (1987), this Court recognized that "Section 2–102 of the UCC provides that '[u]nless the context otherwise requires,' the UCC applies to 'transactions in goods,' a term which has been said to be broader than the sale of goods" (citation omitted).

"Goods" are defined in § 2–105(1), which states:

"Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Title 8) and things in action. "Goods", also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (§ 2–107).

Md.Code (1957, 2002 Repl.Vol.), Commercial Law Art. ("C.L.") § 2–105(1). The Official Comment to § 2–105 further states:

The young of animals are also included expressly in this definition since they, too, are frequently intended for sale and may be contracted for before birth. The period of gestation of domestic animals is such that the provisions of the section on identification can apply as in the case of crops to be planted.

C.L. § 2–105(1). The definition of the goods that are subject to Article 2 of the UCC covers young animals and even the unborn young of animals. The definition of goods would cover the weaner pigs that were raised by Lohman.

Other courts have found that contracts for the sale of pigs are governed by the UCC. *See, e.g., Purina Mills, L.L.C. v. Less,* 295 F.Supp.2d 1017, 1031 (N.D.Iowa 2003) (weanling pigs are goods); *Flanagan v. Consolidated Nutrition, L.C.,* 627 N.W.2d 573, 577 (Iowa Ct.App.2001)(because the definition of "goods" encompasses livestock, Article 2 governs a contract to buy and sell pigs). *See also Embryo Progeny Assoc. v. Lovana Farms,* 203 Ga.App. 447, 448, 416 S.E.2d 833, 834 (1992) (sales of animals found to be transactions in goods).

■ Lohman is correct that the alleged weaner pig purchase agreement involves providing certain services. However, as the trial court correctly observed, the UCC may apply to contracts involving both services and the delivery of goods. These hybrid or mixed sales and services contracts were discussed by the Court of Appeals in *Burton v. Artery Co., Inc.,* 279 Md. 94, 367 A.2d 935 (1977), where the Court adopted the test used in *Bonebrake v. Cox,* 499 F.2d 951 (8th Cir.1974), to assess the UCC's applicability to mixed contracts by analyzing the predominant purpose of the agreement.

*Burton* involved a contract for the sale and installation of trees, shrubs, and sod. The Court explained that the fact that the contract required substantial amounts of labor as well as sales of goods did not remove the contract from the purview of the Uniform Commercial Code. *Burton,* 279 Md. at 108, 367 A.2d 935 (quoting *Bonebrake,* 499 F.2d at 959).

■ The *Bonebrake* test requires examining the contract to determine its main purpose. The court said in *Bonebrake:*
> [T]he cases presenting mixed contracts of this type are legion. The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.,* contract with artist for painting) or is

a transaction of sale, with labor incidentally involved (*e.g.,* installation of a water heater in a bathroom).

499 F.2d at 960 (footnotes omitted). Applying this test, the *Bonebrake* court found that a contract involving the delivery and installation of used bowling equipment was primarily a "goods" contract and was governed by the UCC even though it involved a substantial amount of services.

In *Burton,* the Court of Appeals expressly adopted the *Bonebrake* analysis, stating:

> We adopt the criteria enunciated in *Bonebrake.* We have already concluded that the trees, shrubs, and sod are goods. Burton is a nurseryman. He is engaged, therefore, in selling trees and shrubs. If he also grows sod, then he is engaged in the business of selling sod. The number of trees and shrubs and the substantial amount of sod here involved make this contract much more nearly analogous to the installation of a water heater in a bathroom than to a contract with an artist for a painting. Thus, the predominant factor here, the thrust, the purpose, reasonably stated, is a transaction of sale with labor incidentally involved.

279 Md. at 114–15, 367 A.2d 935.

This Court has applied the *Burton–Bonebrake* test when faced with analyzing mixed contracts involving sales of goods and services. *See, e.g., DeGroft v. Lancaster Silo Co., Inc.,* 72 Md.App. 154, 164, 527 A.2d 1316 (1987) (genuine issue of material fact existed as to whether contract involving the sale and construction of a silo was predominantly a sales or service contract); and *Snyder v. Herbert Greenbaum & Assoc., Inc.,* 38 Md.App. 144, 147–48, 380 A.2d 618 (1977) (primary thrust of contract was the sale rather than the installation of carpet). *Cf. Chlan v. KDI Sylvan Pools, Inc.,* 53 Md.App. 236, 240, 452 A.2d 1259 (1982) (contract for the sale and installation of a concrete in-ground swimming pool not subject to UCC).

In *DeGroft,* 72 Md.App. 154, 527 A.2d 1316, this Court recognized that "[c]ourts have generally looked principally to the language of the parties' agreement and the circumstances surrounding its making in determining the predominant thrust

of the transaction." *Id.* at 168, 527 A.2d 1316 (citations omitted). Moreover, "[i]n analyzing the parties' agreement, it is appropriate to look to the terminology used therein to determine whether it is peculiar to sales or service contracts." *Id.* At 168.

█  In this case, the trial court expressly applied the *Bonebrake* analysis to the alleged contract and concluded that the predominant purpose of the document captioned "Weaner Pig Purchase Agreement" was a sale of goods. The court stated:

> Applying the *Bonebrake* test to the instant contract, the Court finds that the Weaner Pig Purchase Agreement is a mixed contract, but that its predominant thrust and purpose is the sale of weaner pigs to Wagner.... The Court therefore concludes that the principal purpose under the Weaner Pig Purchase Agreement was the sale of pigs with the provision of housing facilities and labor being incidental to those sales. Therefore, the UCC applies to the entire contract. (Footnote omitted.)

The evidence supports the trial court's conclusion that although the agreement called for Lohman to provide certain services, those services were all incidental to the eventual delivery of the specified pigs and did not constitute the main thrust or predominant purpose of the agreement. The predominant purpose of the agreement was the purchase and sale of young pigs. Therefore, the alleged agreement is governed by the UCC.

## II. Does § 2–201 of the UCC require a quantity term in order for the agreement to be enforceable?

The statute of frauds provision applicable to sales transactions, found in C.L. § 2–201(1), reads as follows:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party

against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such a writing.

(For a recap of the historical development of the statute of frauds applicable to sales of goods in Maryland, *see Maryland Supreme Corp. v. Blake Co.*, 279 Md. 531, 546 n. 5, 369 A.2d 1017 (1977).)

Lohman argues § 2–201 should not be read rigidly as requiring a quantity term, but instead should be "liberally construed and applied to promote its underlying purposes and policies," as § 1–102(1) of the Commercial Law Article suggests. Lohman argues that § 2–201 can be read as not requiring a quantity term to be included in the writing, but merely limiting enforcement to the extent of any quantity term that is in fact included in the writing. *See* J. White & R. Summers, UNIFORM COMMERCIAL CODE, § 2–4 at 61 n. 12 (4th ed. 1995) ("An alternative interpretation is that only if the writing states a quantity term is that term determinative."). Lohman also contends, in the alternative, that the weaner pig purchase agreement is an output contract that is enforceable even in the absence of a writing containing a quantity term.

## A. Is a quantity term required?

The Official Comment to C.L. § 2–201 states:

Only three definite and invariable requirements as to the memorandum are made by this subsection. First, it must evidence a contract for the sale of goods; second, it must be "signed", a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity.

The Comment further states:

The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated.... *The only term which must*

*appear is the quantity term* which need not be accurately stated but recovery is limited to the amount stated.

(Emphasis added).

This Court has interpreted § 2–201 as requiring a quantity term in order for an agreement to be enforceable. In *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 53 Md.App. 379, 454 A.2d 367 (1983), *cert. denied*, 295 Md. 736 (1983), this Court refused to find that an agreement existed between a retailer (Cavalier) and a mobile home manufacturer (Liberty) when Cavalier failed to produce any documents evidencing an agreement that would satisfy the statute of frauds. In *Cavalier*, the parties had entered into annual agreements that authorized Cavalier to sell Liberty's mobile homes from 1973 through 1976. In September 1976, Liberty gave Cavalier notice that it was terminating their agreement after 30 days. During the 30–day "wrapping up" period, Cavalier ordered 14 more homes from Liberty that Liberty never delivered. At trial, Cavalier produced three documents it relied upon to show there was an enforceable agreement between the parties with regard to the 14 homes. The Court found that none of the documents produced by Cavalier evidenced the existence of an agreement between the parties, stating:

> The dealership letter lacks terms as to price and delivery conditions, as well as quantity, which would indicate no contractual obligation on the part of Liberty to supply Cavalier with mobile homes. The arrangement was clearly not a requirements contract. The Statute of Frauds requires that even where the quantity term is not numerically stated, there must be some writing which indicates that the quantity to be delivered under the contract is a party's requirements.

*Id.* at 395, 454 A.2d 367.

Similarly, in *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791 (4th Cir.1989), the court interpreted Maryland law as requiring "some writing which indicates ... the quantity to be delivered." *Id.* at 793 (quoting from *Cavalier*, 53 Md.App. at 395, 454 A.2d 367). In *Kline*, the court found that a memoran-

dum regarding the sale of tobacco products did not adequately specify the quantity of goods being sold, and therefore failed to satisfy the statute of frauds. "[W]e must consider whether there is any language in the memorandum *itself* which might satisfactorily indicate 'the quantity to be delivered.' This initial inquiry is plainly required by Maryland's requirement of a *written* quantity term." *Id.* at 794 (emphasis in original).

■ The trial court correctly ruled that § 2–201 requires the written memorandum of a contract for the sale of goods in excess of $500 to contain a quantity term in order for the agreement to be enforceable.

## B. Output Contract

■ Lohman contends in the alternative that the weaner pig purchase agreement was an "output contract," and that it was enforceable pursuant to C.L. Article, § 2–306, irrespective of the statute of frauds. However, this is not a case in which the trial court found that there was a meeting of the minds that could not be enforced because of the statute of frauds; in this case, the trial court specifically found "no evidence that . . . Wagner agreed to purchase a specific number of weaner pigs from Lohman," and found "insufficient evidence that Wagner ever assented to the 300 per week figure inserted by Lohman." The trial court further found that "[n]either the Weaner Pig Purchase Agreement nor any of the individual invoices indicate that the quantity is to be measured by Lohman's output." Here, the only writing signed by Wagner called for Lohman to "supply approximately _____ weaner pigs weekly." The trial court's conclusion that the evidence did not support Lohman's alternative theory that the weaner pig purchase agreement was enforceable as an output contract to which Wagner had agreed was not clearly erroneous.

Because the trial court concluded that Wagner had not agreed to purchase Lohman's output, we need not address whether the trial court erred in stating that output contracts are also subject to the UCC statute of frauds (citing, among other cases, *Alaska Indep. Fishermen's Mktg. Ass'n v. New*

*England Fish Co.,* 15 Wash.App. 154, 160, 548 P.2d 348, 352 (1976); and *Eastern Dental Corp. v. Isaac Masel Co., Inc.,* 502 F.Supp. 1354, 1363–64 (E.D.Pa.1980)). The trial court found that there simply was no meeting of the minds between Lohman and Wagner, and that finding is not clearly erroneous.

### III. Did the Weaner Pig Purchase Agreement contain a quantity term?

■ Lohman's final contention is that the weaner pig purchase agreement did in fact contain a quantity term that satisfies the statute of frauds. However, the trial judge specifically rejected Lohman's argument that the number inserted by Lohman after Wagner signed the document was an agreed quantity that was added with Wagner's consent or assent. The trial judge found:

> The bottom line is that the number "300" was not specifically discussed by Lohman and Wagner at or near the time the Weaner Pig Agreement was faxed to Lohman. ... Lohman testified that *he* decided to insert the "300" figure. Equally important, it is undisputed that Lohman did not send the completed Agreement to Wagner or otherwise notify Wagner of the quantity term that he had inserted on the first page of the Agreement. Applying the preponderance standard of proof, there is insufficient evidence that Wagner ever assented to the 300 per week figure inserted by Lohman. (Footnotes omitted)(emphasis in original).

In view of Wagner's testimony, summarized earlier in this opinion, these findings by the trial judge were well supported by the evidence and were not clearly erroneous.

Relying upon cases from other jurisdictions, in which some courts found one party had authority to fill in blanks left by the other party — *see, e.g., Sentinel Fire Insurance Company v. Anderson,* 196 S.W.2d 649, 651 (Tex.Civ.App.1946), and *Kiker v. Broadwell,* 30 Ga.App. 460, 461–62, 118 S.E. 759, 760 (1923) Lohman contends that the number he inserted without communicating with Wagner is nevertheless binding upon

Wagner. Lohman argues that because Wagner signed the agreement before faxing it, Wagner impliedly gave Lohman the authority to fill in the blanks "in accordance with the parties' understanding." The obvious fallacy in this argument is that the trial court specifically found that there was no such "understanding" between the parties. Consequently, Lohman's argument that the memorandum of the weaner pig purchase agreement did contain a quantity term is not supported by the trial court's findings of fact. *Cf. Romani v. Harris,* 255 Md. 389, 396, 258 A.2d 187 (1969) ("1 Restatement Agency 2d § 24 says: 'One party to a transaction can be authorized to act as an agent for the other party thereto, except for the purpose of satisfying the requirements of the Statute of Frauds,' . . . .").

We conclude that the trial court correctly found the weaner pig purchase agreement did not contain a quantity term as required by the UCC statute of frauds, and therefore, was not enforceable against Wagner.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**