735 A.2d 1081

**BAUSCH & LOMB INCORPORATED**

v.

**UTICA MUTUAL INSURANCE COMPANY.**

No. 40, Sept. Term, 1997.

Court of Appeals of Maryland.

Aug. 26, 1999.

**568**

Rhonda D. Orin, (Jordan S. Stanzler, Lorelie S. Masters, Michael P. Allen, Anderson Kill & Olick, L.L.P., on brief), Washington, DC: Paul Walter, Baltimore, (on brief), for petitioner.

John B. Wyss, (Wiley, Rein & Fielding, on brief), Washington, DC: M. King Hill, III, Venable, Baetjer & Howard, on brief, Towson, for respondent.

E. Charles Dann, Jr., Goodell, Devries, Leech & Gray, L.L.P., Baltimore, for Amicus Curiae Insurance Environmental Litigation Association.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW *, RAKER and WILNER and ROBERT L. KARWACKI (Retired, specially assigned), JJ.

ELDRIDGE, Judge.

We issued a writ of certiorari in this case, involving comprehensive general liability (CGL) policies, to consider the scope of an endorsement which was substituted in place of an exclusion for the insured's own property.

Utica Mutual, the insurer, sold standard form CGL policies annually to Bausch & Lomb from at least 1970 to 1986. The standard language in these policies provided as follows:

"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

A. bodily injury or

B. property damage

to which this insurance applies, caused by an occurrence...."

The policies defined "occurrence" as

"an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured...."

The policies defined "property damage" as

"physical injury to or destruction of tangible property which occurs during the policy period...."

The policies also contained specific exclusions from coverage, including a paragraph (k) which excluded coverage for property owned by, occupied by, rented to, used by, or in the care, custody, or control of the insured.[1] At issue in this case

---

* Chasanow, J., now retired, participated in the hearing of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Exclusion (k) provided that the insurance coverage does not apply to property damage to

are the four policies from 1982 through 1985 which contained endorsement number 18, a separately negotiated rider, which eliminated exclusion (k) and substituted "own property" coverage with a limit of $50,000 per occurrence less a $10,000 per year deductible.[2]

## I.

Bausch & Lomb, a manufacturer of health care and optical products, purchased the Diecraft manufacturing facility in Sparks, Maryland, in 1965. The plant machined and plated parts used in telescopes and microscopes. From 1958 through 1975, the Diecraft plant carried on metal plating activities which created waste plating bath liquids, solvents, and waste waters that were disposed on-site into a waste disposal system composed of a series of settling tanks, an unlined earthen lagoon, a holding tank, three large dry wells, and a network of piping. The disposal techniques did not depart from accepted industrial practices of the time.[3]

---

"(1) property owned or occupied by or rented to the insured,

(2) property used by the insured, or

(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control: but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the named insured[.]"

**2.** Endorsement 18 stated as follows:

" In consideration of the additional premium charged it is agreed that Exclusion K of Coverage Part L6395 AXC (Comprehensive General Liability) does not apply subject to the following additional provisions:

1. With respect to the insurance provided by this endorsement, coverage is not extended to any landlord of premises leased to an insured.

2. The limit of liability stated in this endorsement applies separately to the insurance under this endorsement and is in lieu of any other limit of liability stated in the policy.

\* The definition of property under this endorsement is extended to include personal property.

Limit of Liability $50,000 per occurrence."

**3.** For a more extensive factual background see *Bausch & Lomb v. Utica Mutual*, 330 Md. 758, 766–776, 625 A.2d 1021, 1025–1030 (1993) (*Bausch & Lomb I* ).

In November 1982, Bausch & Lomb first discovered that its property was contaminated with certain heavy metals. Bausch & Lomb reported these findings to the federal Environmental Protection Agency in February 1983. In the fall of 1983, Bausch & Lomb hired an environmental engineering and consulting firm, Fred C. Hart Associates, to investigate the Diecraft property. In mid 1984, Hart discovered that the Diecraft property, in addition to being contaminated with heavy metals, was also contaminated with unacceptable levels of the hazardous chemical compound trichloroethylene (TCE). In November 1985, Hart reported its findings to Bausch & Lomb that the TCE contaminated the subsurface groundwater as well as a small stream that flowed to adjacent land then owned by the Knott Development Corporation. By late 1987, Hart determined that the source of the contamination was the on-site disposal system.

On June 19, 1987, the new owners of the Knott property, Highlands Park I Limited Partnership, threatened to sue Bausch & Lomb, alleging damage to the ground water and surface water on its property. On June 26, 1987, Bausch & Lomb informed Utica of Highland Park's potential claim and requested reimbursement for $76,000 spent to date for testing at the Diecraft facility. This was Bausch & Lomb's first indication to Utica that it expected the insurer to indemnify it for the pollution expenses related to the Diecraft facility. Utica denied coverage in a letter dated July 21, 1987. The neighboring landowner's threat to sue never materialized into an actual lawsuit.

At all times, Bausch & Lomb cooperated with the State of Maryland in performing necessary testing and clean-up of the Diecraft site. A state agency, the Maryland Waste Management Administration, placed the Diecraft facility on the master list of potentially hazardous sites in 1984. In 1986, Bausch & Lomb and the State had a meeting during which Bausch & Lomb indicated its willingness to cooperate with the State in cleaning up the pollution. The State never brought formal administrative enforcement proceedings to order Bausch & Lomb to clean up the Diecraft property. In 1988, after the

present litigation had begun between Utica and Bausch & Lomb, Bausch & Lomb carried out a pollution treatment program devised by Hart and approved by the State. Bausch & Lomb spent approximately $530,000 in investigating and testing the site to determine the extent of the contamination and approximately $231,000 to remove the contaminated sludge that had accumulated in the dry wells on the property.

On November 20, 1987, Utica brought this action against Bausch & Lomb in the Circuit Court for Baltimore County, seeking a declaratory judgment that it had no duty to defend or indemnify Bausch & Lomb for expenses incurred in connection with the contamination of the Diecraft facility. Bausch & Lomb filed a counterclaim for damages for alleged breach of contract. In 1991 the circuit court issued a declaration and a money judgment in favor of Bausch & Lomb for clean-up costs in the amount of $231,262.53, attorneys' fees of $534,500, and expenses in the amount of $44,306.47. The court also declared that Utica had a duty to defend any future actions "brought to compel removal of hazardous waste material, and to pay the cost of removing such material ... depending on whether potential for liability exists...." The court, however, held that Utica did not have a duty to defend or indemnify for "investigatory damages required by the State of Maryland" and for Bausch & Lomb's other expenses in investigating and testing the polluted site.

The circuit court rejected arguments by Utica that Bausch & Lomb's clean-up costs were incurred voluntarily. The court held that, although the State had not brought an enforcement action, it would have done so if necessary and would have required Bausch & Lomb's compliance in cleaning up the site. Additionally, the court rejected Utica's argument that the clean-up costs were not "damages" within the meaning of the policy. The court held that the term "damages" was ambiguous and therefore construed it broadly in favor of Bausch & Lomb. Finally, the circuit court declined to apply the "own property" exclusion, holding that the State's regulatory power with respect to groundwater constituted a sufficient interest to trigger third party coverage.

Both sides appealed to the Court of Special Appeals which reversed and ordered the entry of a declaratory judgment in favor of Utica. *Utica Mutual v. Bausch & Lomb*, 91 Md.App. 1, 603 A.2d 1241 (1992). The intermediate appellate court held that Bausch & Lomb's investigative and clean-up costs were not "damages" within the insurance policy's coverage because CGL policies only indemnify " 'actual, tangible' " damages and not " 'essentially prophylactic measures' " unconnected with " 'any harm to specific third parties.' " 91 Md.App. at 15, 603 A.2d at 1248, quoting *Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348, 1353 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988). The Court of Special Appeals further stated that the cost of Bausch & Lomb's clean-up measures did not constitute liability damages within the meaning of a CGL policy because they were voluntary "preventive" costs. 91 Md.App. at 20, 603 A.2d at 1250. The appellate court rejected Bausch & Lomb's argument that the insurer should pay damages on the theory that the groundwaters underlying the Diecraft site allegedly belonged to the State, and that by contaminating those groundwaters, a third party's property had been damaged. Finally, the Court of Special Appeals held that the circuit court erred in granting Bausch & Lomb judgment for expenses and attorneys' fees.

Both parties filed in this Court petitions for a writ of certiorari, and we granted both petitions. *Bausch & Lomb v. Utica Mutual*, 327 Md. 557, 611 A.2d 115 (1992). This Court disagreed with the Court of Special Appeals' holding that Bausch & Lomb's investigative and clean-up costs were voluntarily taken as merely preventive measures. Instead, we took the position that the "response costs, undertaken in the regulatory context, represented a sum the corporation was legally obligated to pay" because the "tacit threat of formal State intervention was" always present. *Bausch & Lomb v. Utica Mutual*, 330 Md. 758, 780, 625 A.2d 1021, 1032 (1993) (*Bausch & Lomb I*). In addition, this Court held that "environmental response costs fall within" the policy definition of "damages." 330 Md. at 782, 625 A.2d at 1033. Nonetheless, we held that

Utica was not obligated to pay under the standard terms of the CGL policies because no third party property damage had occurred. We held that the State of Maryland's regulatory interest in the ground water "does not constitute a property interest within the contemplation of the insurance policy," 330 Md. at 788, 625 A.2d at 1036. This Court also upheld the Court of Special Appeals' determination that Bausch & Lomb was not entitled to expenses and attorneys' fees.

Bausch & Lomb filed in this Court a motion for reconsideration which this Court denied. Bausch & Lomb alternatively requested that this Court modify its decision "to reflect that Bausch & Lomb is entitled to coverage for damage to its 'own' property, pursuant to endorsement 18, in an amount up to $50,000 per occurrence." In light of Bausch & Lomb's request, this Court modified its initial judgment.[4] Our amended judgment directed that the case be remanded to the circuit court to determine "whether, upon the record in this case, endorsement No. 18 to paragraph (k) of the Utica policy provides coverage of $50,000 per occurrence for damages to Bausch & Lomb's own property." 330 Md. at 791, 625 A.2d at 1037.

On remand, the circuit court issued a new declaratory judgment, declaring that Bausch & Lomb "is entitled to coverage under the 1982–1986 policies under Endorsement 18 in the amount of $160,000.00 ($50,000.00 per year per occurrence less $10,000.00 per year deductible)." The circuit court held that, under the language of endorsement 18, "exclusion (k) doesn't apply" and the endorsement provided "first-party coverage." The circuit court also rejected Utica's contention that Bausch & Lomb should not be entitled to any coverage on the ground that no contaminants were placed in the soil after 1980. Based on evidence taken at the ten day trial of the case

---

4. The initial judgment had read as follows:

"Judgment affirmed in part and modified in part; case remanded to the Court of Special Appeals with directions to remand to the Circuit Court for Baltimore County for entry of a declaratory judgment consistent with this opinion. Costs to be paid by Bausch & Lomb."

in 1990, and specifically on testimony by a hydrogeologic expert, the court found, as a matter of fact, that the damage was continuous throughout the 1982–1985 period. The court stated that "the damage of contamination through what was in the soils, was occurring all during this period of time."

The next issue considered by the circuit court was whether Bausch & Lomb was required specifically to "prove what portion of the damage occurred in '82,'83,'84, and '85." The court stated that, although property damage occurred during each of the applicable policy years, the technology to determine precisely the amount of property damage during each policy year was currently unavailable. The court said that

"some day the technology is going to be there that somebody is going to be able to do a plug in the … property and they are going to be able to say that based upon the make-up of this property and the soil, that we can tell in 2006 that in 1994 X amount was deposited on the Bausch and Lomb site. We know that because we know the rainfall, we know how fast these materials travel; we now in 2006 know the water tables, and therefore it is a simple matter of quantitative analysis for us to tell drilling this far away from the site how much was deposited.

"Now, I have no question in my mind but that that technology is not available today. Frankly, it probably won't be available in 2006.2016 and 2026 are more like it. . . .

"The Court of Appeals has to make a public policy decision in this case. They can only base it upon testimony. If I'm correct and witnesses sit there and testify from the witness stand that they do not have that technology today, that it does not exist in the industry, that they cannot definitively state to me today in 1994 that there are any tests to show what the damage was and how much of this $231,000 was applicable, then the Court of Appeals has an alternate decision to make; number one, they have the right to say you can't prove specifically your damages, so therefore we are not going to let you recover anything; or secondly, not being able to do that, all sums means all sums

on the trigger of damage to the property, and therefore you have to pay everything."

Although the court stated that the technology to prove damages with specificity was unavailable, it held that Bausch & Lomb was entitled to the full first party coverage under the 1982 to 1985 policies because some damage occurred during each covered policy period.

Finally, the circuit court concluded that Bausch & Lomb was entitled to $561,000 in attorneys' fees. This amount consisted of $376,000 for legal work before and during trial, $125,000 for work on the appeals, and $60,000 for work after the remand.

Utica appealed to the Court of Special Appeals. In an unreported opinion, the intermediate appellate court held that "Endorsement 18 does provide B & L with what amounts to 'first party' coverage." The appellate court reasoned that there was no ambiguity in the policy language:

"Endorsement 18 states that, up to a limit of $50,000 per occurrence, Exclusion (k) does not apply. Thus, by removing Exclusion (k) from the contract, Utica 'will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages ...'" (emphasis omitted).

Although the policy language provided first party coverage, the Court of Special Appeals held that it was "premature for the circuit court to award the policy limits" because the "precise amount of damages that 'occurred' during each policy year at issue cannot be resolved on the record in this case." The Court of Special Appeals also reversed in part the circuit court's award of attorneys' fees to Bausch & Lomb. The intermediate appellate court held that the trial court was entitled to award Bausch & Lomb only the $60,000 in attorneys' fees which related exclusively to the proceedings after the remand. The Court of Special Appeals reasoned that Bausch & Lomb was not entitled to the other attorneys' fees which the circuit court had awarded because the Court of Appeals previously had decided that Bausch & Lomb was not

entitled to recover those fees. The Court of Special Appeals stated that "the Court of Appeals would have mentioned counsel fees [in its remand order] if the Court contemplated that, on remand, the circuit court should revisit the issue of the insured's entitlement to reimbursement for any counsel fees incurred as of July 12, 1993." Because this Court had not given such instructions in *Bausch & Lomb I,* the intermediate appellate court decided that "the law of the case doctrine prohibited a subsequent apportionment of counsel fees incurred in Round One." The Court of Special Appeals held that Bausch & Lomb was entitled to the attorneys' fees incurred after the remand because endorsement 18 did provide limited coverage under the CGL policies, and "it was Utica who requested a judicial declaration that 'Utica Mutual . . . is under no obligation to pay any of Bausch & Lomb's expenses in connection with the . . . remediation efforts at the Diecraft site.' "

Both parties again filed petitions for a writ of certiorari which this Court granted. *Bausch & Lomb v. Utica Mutual,* 346 Md. 28, 694 A.2d 951 (1997). In their certiorari petitions, the parties asked this Court to consider whether: (1) endorsement 18 provides first party coverage; (2) whether the precise amount of property damage must be proven for each applicable policy year in order to obtain coverage; and (3) whether Bausch & Lomb is entitled to an attorneys' fees award.

## II.

The first question is whether first party coverage results from the elimination of exclusion (k) and the substitution of endorsement 18 in the 1982 through 1985 CGL policies.

## A.

Utica takes issue with the Court of Special Appeals' ruling that "Endorsement 18 provides coverage beyond that of the standard CGL policy of up to $50,000 per occurrence during the policy period." Utica contends that this is error because the "deletion of an exclusion cannot expand the scope of

coverage provided by the basic insuring agreement." (Utica's brief at 13). The insurer argues that this Court ruled, in *Bausch & Lomb I,* that Bausch & Lomb's clean-up costs were outside the scope of CGL coverage based solely on the terms of the insuring agreement without relying on exclusion (k). Utica interprets this Court's previous acknowledgment that exclusion (k) had been deleted in some Utica policies to mean that the "Court's ruling regarding the scope of coverage provided by the standard terms of the CGL insuring agreement was necessarily independent of either the presence or absence of the exclusion 'k' provision." (*Id.* at 16, n. 10, 603 A.2d 1241). Based on this interpretation of our prior opinion, Utica maintains as follows:

"Exclusion 'k,' of course, is itself a limitation on scope of coverage otherwise provided by the standard language of the CGL insuring agreement. Thus, at best, ... Endorsement 18 simply restores coverage that was excluded by exclusion 'k.' It does not create coverage that cannot be found in the basic CGL insuring agreement." (*Id.* at 16–17, 603 A.2d 1241).

Finally, Utica argues that Bausch & Lomb is not entitled to coverage because exclusion (k) has a "fundamental 'third party' nature" which cannot be altered by modification or deletion. (Utica's reply brief at 5). Utica contends that exclusion (k) is "designed to address a wide variety of situations in which a third party may also have a true 'property interest' in property which is otherwise held or controlled by the insured." (*Id.* at 4–5, 603 A.2d 1241). Therefore, Utica asserts that when the exclusion is modified or deleted, coverage is only restored for certain third party damage claims for property in which that third party holds a property interest.

Bausch & Lomb argues that the CGL agreement provides coverage for both third party property damage and damage to property owned by Bausch & Lomb. Bausch & Lomb contends that "the mere existence" of exclusion (k) demonstrates that the standard form CGL policies provide coverage for liability for damage to one's own property. Otherwise, Bausch & Lomb reasons, "there would be no need for this exclusion" if

the basic insuring agreement did not originally cover damage to one's own property. (Bausch & Lomb's reply brief at 10). Bausch & Lomb disagrees with Utica's contention that this Court's previous ruling was independent of exclusion (k). Bausch & Lomb argues that our prior opinion took exclusion (k) into consideration but "expressly carved out the Utica policies containing Endorsement 18 from its ruling...." (*Id.* at 11, n. 11, 603 A.2d 1241).

### B.

At the outset, it is important to reiterate what this Court did, in fact, decide in *Bausch & Lomb I* about exclusion (k) and endorsement 18. When this Court decided this case in 1993, the principal issues presented were whether environmental clean-up costs constituted covered "damages" within the meaning of the policies and whether the State's regulatory interest was sufficient to justify coverage for third party property damage. Both the circuit court and the Court of Special Appeals had reached conclusions concerning these issues which were independent of exclusion (k), and neither court considered the effect of endorsement 18. Although this Court's opinion mentioned the existence of exclusion (k) and endorsement 18,[5] our holdings were not based upon those provisions of the policy. In fact, that is why this Court's amended judgment instructed the circuit court to decide whether "endorsement No. 18 to paragraph (k) of the Utica

---

5. In *Bausch & Lomb I*, 330 Md. at 765, 625 A.2d at 1024–1025, our opinion mentioned exclusion (k) and endorsement 18 when it was describing the terms of the Utica and Bausch & Lomb policies. We stated:

"The standard form policy also included 17 specific exclusions from coverage, of which two have some bearing on this case. One provision, paragraph (*l*), excluded coverage for property damage to premises alienated by the insured. The second, paragraph (k), comprised the so-called 'own property' provision excluding coverage for property damage to property owned by, occupied by, rented to, used by, or in the care, custody, or control of the insured, B & L. Under a separately negotiated rider, endorsement # 18, the parties eliminated the standard exclusion in paragraph (k) and substituted 'own property' coverage with a limit of $50,000 per occurrence."

policy provides coverage of $50,000 per occurrence for damages to Bausch & Lomb's own property." 330 Md. at 788, 625 A.2d at 1037. In *Bausch & Lomb I,* we held that "in the absence of third party property damage, Utica was not obliged by the standard terms of the CGL contract to pay B & L's abatement expenses incurred at the State's behest." 330 Md. at 788, 625 A.2d at 1036. We did not, however, reach the issue of whether the elimination of exclusion (k) and the substitution of endorsement 18 afforded Bausch & Lomb first party coverage under the CGL policies. That is the issue which is now before this Court.

 When determining coverage under an insurance policy, "the primary principle of construction is to apply the terms of the insurance contract itself." *Bausch & Lomb I,* 330 Md. at 779, 625 A.2d at 1031. *See also Chantel Associates v. Mt. Vernon,* 338 Md. 131, 142, 656 A.2d 779, 784 (1995); *Harford County v. Harford Mut. Ins.,* 327 Md. 418, 434, 610 A.2d 286, 294 (1992); *Mitchell v. Maryland Casualty,* Co., 324 Md. 44, 56, 595 A.2d 469, 475 (1991). In doing so, we ascertain the parties' intentions from the policy as a whole. *Bausch & Lomb I,* 330 Md. at 779, 625 A.2d at 1031. In construing the terms of the insurance contract, unless "there is an indication that the parties intended to use words in the policy in a technical sense, we accord the words their usual, ordinary, and accepted meaning." *Bausch & Lomb I,* 330 Md. at 779, 625 A.2d at 1031. *See also Chantel Associates v. Mt. Vernon, supra,* 338 Md. at 142, 656 A.2d at 784; *Mitchell v. Maryland Casualty, supra,* 324 Md. at 56, 595 A.2d at 475.

The language in the 1982 through 1985 CGL policies demonstrates an intent that certain claims be covered for damages to Bausch & Lomb's own property. Endorsement No. 18 states that exclusion (k) "does not apply" and adds further provisions to explain the scope of the new "own property" coverage. The endorsement limits the new coverage by stating that the coverage does not extend to any landlord of premises leased to Bausch & Lomb. It states that the limit of liability is $50,000 and that the limit "applies separately to the insurance under

this endorsement and is in lieu of any other limit of liability stated in the policy." Endorsement 18 is a complete substitute for the previous exclusion (k) which excluded insurance coverage for property owned, occupied, rented, used by, or in the care, custody or control of the insured. As further evidence of the parties' intent to create a limited coverage for damages to Bausch & Lomb's own property, endorsement 18 states that it was separately negotiated and agreed upon "in consideration of the additional premium charged." The plain meaning of endorsement 18's language is to provide coverage for damage to Bausch & Lomb's own property. Nothing in the language of endorsement 18 supports Utica's theory that the endorsement only covers property of the insured in which a third party holds a property interest.

In support of its contention that the policies do not afford coverage for Bausch & Lomb's own property, Utica quotes this Court's previous statement in *Bausch & Lomb I*, 330 Md. at 783, 625 A.2d at 1033, that a "hallmark of the comprehensive general liability policy is that it insures against injury done to a third party's property, in contradistinction to an 'all-risks' policy also covering losses sustained by the policyholder." Although a CGL policy is primarily for the purpose of insuring against third party liability, it is not at all unusual for a liability policy also to provide some first party coverage. For example, automobile liability insurance policies typically provide coverage for third party liability claims as well as first party claims such as uninsured motorist claims, collision, comprehensive, medical payments, and personal injury protection. *See e.g., Erie Insurance v. Curtis*, 330 Md. 160, 169, 623 A.2d 184, 189 (1993), quoting *Reese v. State Farm Mut. Auto. Ins.*, 285 Md. 548, 552, 403 A.2d 1229, 1231–1232 (1979) (" 'uninsured motorist coverage is in insurance parlance "first party coverage" like collision, comprehensive, medical payments or personal injury protection, and not "third party coverage" such as personal injury or property damage liability insurance' "). Homeowners insurance policies also provide third party liability coverage and first party coverage.

In essence, "first party coverage" is "a promise by the insurer to pay its own insured, rather than a promise to its insured to pay some third party." *Reese v. State Farm Mut. Auto. Ins., supra,* 285 Md. at 552, 403 A.2d at 1231. The substitution of endorsement 18 for exclusion (k), and the language of endorsement 18, create first party coverage. It is Utica's "promise to pay its own insured, rather than a promise to its insured to pay some third party." *Reese,* 285 Md. at 552, 403 A.2d at 1231.

Utica's argument that the deletion of an exclusion cannot expand the basic insuring agreement's coverage is not persuasive in light of the policy language in this case. Endorsement 18 did not merely delete or modify exclusion (k); rather, it substituted new "own property" coverage. Utica relies on two Court of Special Appeals cases to support its contention that no coverage is available because an exclusion cannot grant coverage. *See Century I Joint Venture v. USF & G Co.,* 63 Md.App. 545, 493 A.2d 370, *cert. denied,* 304 Md. 297, 498 A.2d 1183 (1985); *Simkins Industries, Inc. v. Lexington Ins.,* 42 Md.App. 396, 401 A.2d 181, *cert. denied,* 285 Md. 730 (1979). Neither of these cases involved an endorsement which substituted additional coverage for damage that was otherwise excluded by the policy.

In the present case, if there is a conflict between endorsement 18 and the main policies, the endorsement controls, although an effort should be made to construe the endorsement and the policies in harmony. *Truck Ins. Exch. v. Marks Rentals,* 288 Md. 428, 436, 418 A.2d 1187, 1191 (1980) ("Of course, if the provisions of the endorsement were in conflict or inconsistent with the master policy, the endorsement would control to the extent of the conflict or inconsistency. * * * [G]enerally, [however], an endorsement and the main policy to which it relates together constitute a single insurance contract, and an effort should be made to construe both in harmony"). Here, the parties separately negotiated endorsement 18, and Bausch & Lomb paid an additional premium for the endorsement. The language of the endorse-

ment clearly provides coverage for the insured's own property. Insureds may obtain coverage for a matter previously excluded because of a separately negotiated endorsement's addition of coverage. *See, e.g., Home Exterminating v. Zurich–American*, 921 F.Supp. 318 (D.Md.1996) (federal district court, applying Maryland law, held that an insured was entitled to coverage for negligent application of pesticides because an endorsement restored coverage otherwise precluded by the policy's pollution exclusion).

## III.

Having decided that the 1982 through 1985 CGL policies grant "own property" coverage with a limit of $50,000 per occurrence, we are next asked to decide whether the amount of property damage must be proven for each policy year in order for Bausch & Lomb to recover.

## A.

Bausch & Lomb argues that the Court of Special Appeals erred when it ruled that the amount of damage for each policy year must be determined. First, the insured asserts that "Utica promised in its insurance policies to pay 'all sums' which Bausch & Lomb suffered as damages by reason of covered events." (Bausch & Lomb's brief at 9). Bausch & Lomb maintains that this policy language does not mean that Utica will only pay for a "quantifiable portion of property damage that takes place during the applicable policy period." (*Id.* at 10). Rather, Bausch & Lomb argues that so long as the "property damage takes place, at least in part, during a policy period, it is irrelevant to the insurance company's liability if the property damage also took place in part during another policy period." (*Ibid.*). Bausch & Lomb asserts that the policies' definition of property damage, as that which takes place "during the policy period," does not modify Utica's obligation to pay "all sums." (*Ibid.*). The insured argues that the definition of property damage "establishes only that a particular policy is *triggered* by damage during the policy

period." (Bausch & Lomb's reply brief at 29–30). Bausch & Lomb refers to the policies' definition of "occurrence" which includes "continuous or repeated exposure to conditions" as proof that the insurer contemplated "that coverage might be triggered over successive policy periods, giving rise to successive obligations to pay damages." (*Id.* at 31). Bausch & Lomb interprets the policies as merely requiring the insured to show that some property damage took place during the policy periods at issue.

In addition to the policy language, Bausch & Lomb also contends that it should not have to prove the precise amount of property damage during the 1982–1985 period because it is impossible to do so. The insured asserts that environmental property damage "is a progressive harm that is indivisible" and that "no one can determine how much indivisible injury took place in a particular year." (Bausch & Lomb's brief at 13). Bausch & Lomb urges this Court not to order that the record be reopened because "it still would be impossible to prove the precise amount of damage that took place during each policy year." (*Id.* at 15).

Utica argues that the "policies require B & L to prove that the property damage attributable to contamination that took place within each policy's effective dates exceeds $10,000." (Utica's brief at 29). Utica bases this contention on the policies' definition of "property damage" as that which takes place "during the policy period" and on endorsement 18's requirements of a $10,000 deductible. (*Id.* at 31). Utica, relying on *Harford County v. Harford Mut. Ins., supra,* 327 Md. at 436, 610 A.2d at 295, asserts that Bausch & Lomb has the "burden to present evidence that 'during the policy period the discharge of contaminants into the soil and underlying groundwater is of sufficient gravity to prove detectable "property damage" within the policies' definition of that term....'" (*Id.* at 33, emphasis omitted).

Utica submits that Bausch & Lomb is unable to prove that more than $10,000 in property damage took place during each of the applicable policy periods. It argues that Bausch &

Lomb cannot show any further damage to the soils after 1980 because "[a]ll dumping of pollutants into the soils ceased completely by 1980. . . ." (*Id.* at 34). Because the polluting discharges ceased, Utica asserts that "it is physically impossible for there to have been any additional soil contamination during the four policy years at issue from 1982 to 1985." (Utica's reply brief at 9, emphasis omitted). The insurer points to Bausch & Lomb's assertion that there was some "continued seepage" until 1988 of the TCE from the contaminated soils into the groundwater. Utica observes that Bausch & Lomb only paid to remediate the damage to the soils and not the groundwater. The insurer argues that such seepage is not damage to the soils. Rather, Utica contends that "this seepage represents a natural cleansing of the contaminated soils which started in 1975 and continued throughout the 1980s." (Utica's reply brief at 9, emphasis omitted).

Utica also contends that Bausch & Lomb is attempting to "unilaterally assign" 30 years of property damage to "only four years." (Utica's brief at 34). Utica maintains that coverage of Bausch & Lomb's clean-up costs would be contrary to the language of the policies which have "discrete and finite policy periods" and expressly provide that the coverage extends to property damage which occurs "during the policy period." (*Id.* at 36, emphasis omitted). Utica refutes Bausch & Lomb's "all sums" argument, stating that the "Utica policies do not cover 'all sums' without regard to the timing of the injury. Rather, they explicitly cover all sums which are payable 'because of' property damage 'which occurs during the policy period.'" (*Id.* at 37, emphasis omitted).

### B.

When reviewing the judgment in a case tried without a jury, an appellate court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous. . . ." Maryland Rule 8–131(c); *Murphy v. 24th St. Cadillac,* 353 Md. 480, 497, 727 A.2d 915, 923 (1999); *Stevenson v. Steele,* 352 Md. 60, 69, 720 A.2d 1176, 1180 (1998); *Urban Site v. Levering,* 340 Md. 223, 229–230, 665 A.2d 1062, 1065 (1995).

The appellate court must "give due regard to the opportunity of the trial court to judge the credibility of the witnesses," Maryland Rule 8–131(c), and to "judge 'the weight to be attached to the evidence.' " *Murphy v. 24th St. Cadillac, supra,* 353 Md. at 497, 727 A.2d at 924, quoting *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834, 836 (1975). We "defer to the trial court's resolution of disputed facts," *Stevenson v. Steele, supra,* 352 Md. at 69, 720 A.2d at 1180, and do "not substitute our judgment or interpretation of the facts for that of the trial court so long as those conclusions are supported by the evidence." *Murphy,* 353 Md. at 497, 727 A.2d at 924.

When this case originally was tried in 1990, it was not contemplated that the issue would ultimately become whether or not the policies provided first party coverage. Consequently, the testimony focused on issues broader than the amount of damages per year between 1982 and 1985 to Bausch & Lomb's own property in light of the limited coverage under endorsement 18. The evidence was focused on whether several CGL policies from 1970 to 1986 provided much more extended coverage for Bausch & Lomb's clean-up costs.

Also, the circuit court was initially operating under a manifestation trigger of coverage under *Harford Mut. Ins. v. Jacobson,* 73 Md.App. 670, 536 A.2d 120, *cert. denied,* 312 Md. 601, 541 A.2d 964 (1988), which stated that the time of the "occurrence" within the policy's coverage is the time when the property damage first manifested itself. The circuit court ruled that Bausch & Lomb's CGL policies were triggered in 1984 because that is when the TCE was first discovered. This Court's subsequent cases made clear that manifestation is not the sole trigger of coverage. *See Harford County v. Harford Mut. Ins., supra,* 327 Md. at 435–436, 610 A.2d at 294–295 (in the context of continuing environmental property damage, a CGL policy "may be triggered during the policy period at a time earlier than the discovery or manifestation of the damage" in order to prevent the unfair transformation of "the more expensive occurrence policy into a cheaper claims made policy"); *Mitchell v. Maryland Casualty, supra,* 324 Md. at

62, 595 A.2d at 478 (neither mere exposure to asbestos nor manifestation of bodily injury were correct as the sole trigger of coverage). After we remanded the instant case to the circuit court, the court relied on its earlier alternative ruling that there was continuous property damage from 1975 through at least 1986. The circuit court specifically relied on the testimony of Bausch & Lomb's hydrogeologic expert in finding that it was "convinced that some damage did occur" in each of the relevant policy periods.

As mentioned previously, in the hearing after remand, the circuit court expressed its opinion that the technology to measure more specific property damage during each policy year is not currently available. The court did not rely on any testimony, expert opinion, or other evidence in making this assertion. Instead, the trial judge stated that *"if I'm correct* and witnesses sit there and testify from the witness stand that they do not have that technology today, that it does not exist in the industry, that they cannot definitively state to me today in 1994 that there are any tests to show what the damage was and how much of this $231,000 was applicable, then the Court of Appeals has" a decision to make.

█ The Court of Special Appeals correctly held that the record in this case is inadequate on the issue of proof of damages. While it is true that we defer to the trial court's judgment in weighing the evidence and judging the credibility of witnesses, these conclusions must be supported by evidence. The record before us contains no evidence on the amount of environmental property damage to Bausch & Lomb's own property during the applicable period. In *Harford County v. Harford Mut. Ins., supra,* 327 Md. at 436, 610 A.2d at 295, we stated that the determination of the amount of property damage, to ascertain whether it falls within policy coverage, is "quite likely a matter for expert testimony." Furthermore, the trial judge's conclusion that the technology is unavailable to determine this damage is not supported by *any* evidence. We are not willing to rely on the trial judge's opinion on the proof issue which was unsupported by any testimony or

evidence on the subject. Unless and until there is evidence supporting a finding that the technology is unavailable to determine the amount of damage during the period covered by the policies containing endorsement 18, it would be premature for this Court to explore the legal consequences of such a finding under the circumstances of this case. Upon remand to the circuit court, the parties should be given the opportunity to introduce evidence as to these matters.

With respect to Utica's factual arguments as to whether or not the damage could have even possibly occurred during the pertinent period, these issues were resolved by the supported findings of the circuit court. Utica seems to argue that environmental contamination during the 1982 to 1985 period was impossible because Bausch & Lomb ceased dumping before that period. As previously discussed, the circuit court found, based on expert testimony, that property damage continued to occur from 1982 through 1985. The hydrogeologic expert testified at trial as follows:

"Although the input of metals waste presumably ceased in 1975 from the metal plating operation and although the input of the degreasing solvents presumably ceased approximately in 1980 and the sewer line was hooked up to the facility, there was still a considerable concentration of TCE and metals in sludge that was sitting out in the environment. And our feeling was, particularly with regard to TCE, that whenever rainwater entered the dry wells, that it could continue to flush TCE out into the environment even though the waste disposal system was not actually being used."

There was sufficient evidence in the record for the circuit court to find that contamination continued through 1985. Consequently, the finding is not clearly erroneous, and we shall not disturb it.

## IV.

The final issue is whether Bausch & Lomb is entitled to an attorneys' fee award. The insured argues that it is entitled to

all of its attorneys' fees for work before and after remand because Utica breached its duty to defend. Bausch & Lomb asserts that the Court of Special Appeals interpreted our judgment in *Bausch & Lomb I* too narrowly when the Court of Special Appeals decided that the judgment would have mentioned counsel fees if this Court had intended that the issue be considered. Bausch & Lomb contends that the "Court's remand order did not preclude the circuit court from awarding all of the attorneys' fees that flow from the decision in favor of coverage under Endorsement No. 18." (Bausch & Lomb's brief at 16). Taking issue with the Court of Special Appeals' reliance on the law of the case principle, Bausch & Lomb points out that this Court never addressed the issue of coverage or attorneys' fees with respect to endorsement 18.

Utica contends that Bausch & Lomb should not be able to recover any of its attorneys' fees. First, the insurer argues that under Maryland law "a policyholder cannot recover attorneys fees incurred in a suit against its insurer, except in the case of a liability insurer which breached its promise to defend or to pay the cost of defense." (Utica's brief at 22). Utica maintains that it breached no duty to defend and that, therefore, Bausch & Lomb is not entitled to recover any attorneys' fees. The insurer relies upon our holding in *Bausch & Lomb I*, 330 Md. at 790, 625 A.2d at 1037, that Utica had "breached no duty to defend." The insurer points out that first party property insurance, "unlike third party liability coverage, does not involve any contractual defense obligation." (Utica's reply brief at 16).

Maryland follows the American rule which "stands as a barrier to the recovery, as consequential damages, of foreseeable counsel fees incurred in enforcing remedies for" breach of contract. *Collier v. MD–Individual Practice*, 327 Md. 1, 13, 607 A.2d 537, 543 (1992). Therefore, in the absence of a statute, rule or contract expressly allowing the recovery of attorneys' fees, a prevailing party in a lawsuit may not ordinarily recover attorneys' fees. *Hess Construction v.*

*Board of Education,* 341 Md. 155, 159, 669 A.2d 1352, 1354 (1996); *Collier,* 327 Md. at 11–13, 607 A.2d at 542–543.

There is one nonstatutory exception to the American rule in actions involving insurance policies. Where an action is brought to enforce an insurer's obligations under the third party liability provisions of a policy, and it is determined that there is coverage under the policy, the insurer is liable for the prevailing party's attorneys' fees. *See, e.g, Mesmer v. M.A.I.F.,* 353 Md. 241, 264, 725 A.2d 1053, 1064 (1999) ("damages for breach of the contractual duty to defend [the insured against liability claims] are limited to the insured's expenses, including attorney fees, in defending the underlying tort action, as well as the insured's expenses and attorney fees in a separate contract or declaratory judgment action if such action is filed to establish that there exists a duty to defend"); *Litz v. State Farm, supra,* 346 Md. at 232, 695 A.2d at 573; *Hess Construction v. Board of Education, supra,* 341 Md. at 160, 669 A.2d at 1354 ("The principal exception [to the American rule] is for counsel fees incurred by an insured in successful litigation with a liability insurer which denied coverage or a duty to defend"); *Bankers & Ship. Ins. Co. v. Electro Enter., Inc.,* 287 Md. 641, 648, 415 A.2d 278, 282 (1980).

Nevertheless, as the above-cited cases indicate, and as this Court flatly held in *Collier v. MD–Individual Practice, supra,* 327 Md. at 12–17, 607 A.2d at 542–545, this exception to the American rule is limited to the enforcement of "third-party liability coverage" and does not apply to actions against an insurer to enforce first party coverage. In holding that counsel fees were not recoverable in an action against an insurer to enforce first party coverage (health benefits), Judge Rodowsky for the Court explained in *Collier* as follows (327 Md. at 16–17, 607 A.2d at 544–545):

"From the standpoint of a strict application of the American rule, there is no logical reason why the successful plaintiff's action on a liability insurance policy for breach of a promise to defend, or to pay the cost of defense, should include counsel fees in prosecuting the breach of contract

action, when successful plaintiffs' actions for other breaches of insurance contracts, or for breaches of other contracts, do not ordinarily include those counsel fees. The Maryland rule awarding to the successful insured counsel fees in declaratory judgment or assumpsit actions with liability insurers for breach of the promise to defend or to pay the cost of defense is an exception to the American rule. To extend that exception to health insurers, who breach their contracts by failure to pay covered benefits, will only compound the anomaly. It would probably mark the elimination of the American rule as to contract actions against insurers generally and leave in doubt the efficacy of the American rule as to other types of contracts.

"With the exception of cases involving liability insurers and cost of defense, Maryland law has never recognized fee shifting in breach of contract actions, absent contractual provision, statute or rule. We leave that law as we find it."

■■■ As previously discussed, the insurance coverage provided by endorsement 18 is clearly first party coverage. It is not third party liability coverage. Therefore, under *Collier*, Bausch & Lomb cannot recover attorneys' fees. If, after further proceedings in the circuit court, Bausch & Lomb recovers damages under endorsement 18, the insured will not be entitled to attorneys' fees.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE EVENLY DIVIDED.*